THE CITY OF CHICAGO, in trust for the use of Schools, Appellant, *vs.* JANE A. CUNNEA *et al.* Appellees.

*Opinion filed February 24, 1928—Rehearing denied April 5, 1928.*

1. EMINENT DOMAIN—*just compensation is measured by value of property taken.* Just compensation for the taking of property for public use means the payment of such sum of money as will make the owner whole, so that on receipt of the compensation he will not be poorer by reason of his property being taken, and the measure of compensation is a sum of money that is the equivalent of the value of the property or the amount in cash which the property would sell for under ordinary circumstances where the owner is willing to sell and the purchaser willing to buy; and the fact that in a particular case the owner is not willing to part with his property should not be considered.

2. SAME—*general rule as to when the verdict will be set aside.* Where the evidence is conflicting and the verdict is within the range of the testimony, the finding of the jury as to the amount of compensation for the property taken will not be disturbed unless there is something in the record showing that they have been influenced by passion or prejudice or that there has been some incorrect ruling of law by the trial court which might have misled them, but if there is such showing the petitioner for condemnation will be entitled, on appeal, to a new trial even though there is no assignment of error that the verdict is excessive.

3. SAME—*when petitioner will be given new trial for misconduct of counsel.* Where counsel for property owners, in a condemnation proceeding for school purposes, ridicules the opinion of one of the petitioner's witnesses as to the value of the property by asking the witness on cross-examination what could be done by an "ousted" property owner with so little compensation, and in his argument to the jury urges the point that the owners are being put out of their property unwillingly, that the State is taking "their homes away" and is able to pay for exercising such sovereign power, the petitioner will be given a new trial, especially where the trial court does not take prompt action to correct the erroneous impression created by such misconduct.

4. SAME—*when court should direct jury to disregard statement of witness.* Where the court in first ruling upon the answer of a witness, which opposing counsel moves to strike, expresses the opinion, in the presence of the jury, that the answer is proper but

afterwards changes the ruling and says "strike it," the jury should be expressly directed to disregard the witness' statement, as the order to strike the answer does not in such case sufficiently correct the error.

FARMER and STONE, JJ., dissenting.

APPEAL from the Circuit Court of Cook county; the Hon. OSCAR M. TORRISON, Judge, presiding.

FRANK S. RIGHEIMER, (RALPH W. CONDEE, and JOHN A. COOKE, of counsel,) for appellant.

LYMAN, ADAMS, BISHOP & DUPEE, and HARRY HARMON, for appellees.

Mr. COMMISSIONER CROW reported this opinion:

The proceeding in the circuit court was under the Eminent Domain statute to acquire certain lots in Chicago for school purposes. The jury returned a verdict finding the value of each lot, and after motion by petitioner for a new trial was overruled, judgment was entered on the verdict and an appeal perfected to this court.

There is no controversy as to the location or character of the property involved nor its environment. Each is residence property, consisting of frame buildings with brick foundations, built more than thirty years before the trial. The ground as originally surveyed constituted one lot but was afterwards subdivided into six lots, numbered from 1 to 6, the corner lot being sub-lot 1. It is 32 by 97 feet. Each of the others is 27 by 97 feet. There is no alley in the rear nor on the side of any of the lots. The building on the corner of Marquette avenue and Seventy-seventh street was originally an eight-room dwelling but was converted into two flats, each rented at the time of the trial for $25 a month. They are heated by stoves and lighted by gas. The other houses are practically alike, except that a porch has been added to the rear of the house on lot 3.

They are smaller than the corner house, each having six rooms, with electric lights and furnace heat. Bricks in the foundations of some of the houses were loose and in some they had fallen out of the foundation. The transportation facilities are the surface lines and the Illinois Central railroad, with frequent trains at certain hours of the day, Windsor Park station being near the property, and both lines extending to the city and to the steel industries on the south. The street pavement in front of the property is asphalt. The sidewalks are concrete. Both streets are in good condition.

Three witnesses testified on behalf of the petitioner as to the value of the property. The first placed the aggregate value of the lots at $36,400, the second at $36,500, the third at $30,600. For respondents one witness placed the aggregate value at $70,500, another at $73,500, another at $76,190. Four other witnesses testified to substantially the same values. The aggregate value as found by the jury was $49,500.

In the opening statement to the jury before evidence was heard, counsel for respondents said: "As you know, the property owner has no choice in the matter of whether property should be condemned or not. The city has a right, under the law, to take their property and the owners have nothing to say about that. They can't ask the city to take it and can't prevent the city from taking it. But the constitution says that no property shall be taken or damaged without paying just compensation, and our evidence is to show what that just compensation is. We expect to show that these people live in their own homes, have been living there for some time, and if their property is taken away they will have to seek homes elsewhere, and they should be made not any richer, but certainly not any poorer, as a result of having their property taken away." In the cross-examination of a witness for the petitioner counsel asked: "Do you think it would be much help to them [the respond-

ents] if they were out on the street with $6000, looking for a home?" Again: "You [the witness] are here advising this jury to place these people out of their homes and give them $6000. What I am asking if you are going to be equally fair to the city of Chicago, I want to know what you are going to do with these property owners when they get the $6000 and ousted from their home; what are you going to give them in its place?" Objection being made by petitioner, the court sustained it to the part "about being ousted." Of another owner counsel inquired: "You have not any desire to have this property condemned, have you?" Objection to the question again being made, a speech was delivered in justification of the question. The idea of counsel in asking the question, he said, was that the witnesses for the city had created the impression that the owners were trying to sell the property, and he wanted to show that they did not wish to sell it and that they were satisfied with it. He said further: "I think that has a bearing on the question of what we are going to do with the money in getting other property." The court said: "I do not think there has been any testimony that these people are desirous of disposing of it." Further argument having been made in support of the question, the court said: "I think I will sustain it; I do not think it will affect the market value." Exceptions were taken by petitioner to the remarks of counsel and the court was requested to instruct the jury to disregard the remarks. The court refused, saying he would do so "in the instructions to the jury when the time comes."

Again, during the examination of one of the owners of the property this question was asked: "Have you made an examination of this neighborhood with the idea of determining whether if you lose this property in these proceedings you will be in a position to get property just as good?" On objection the court said: "Your question is—should be—have you made an investigation?" Counsel then in-

quired: "Have you made an investigation in the neigh-
borhood to determine whether there is any other property
available for use as a home,—to purchase as a home,—simi-
lar in character to this property?" The answer was, "Yes."
Counsel then asked: "Mrs. Smith, in your opinion, do
you believe you could secure any other property for use as
a home, similar in character to this property, for $12,000?"
Objection by petitioner being made, after remarks by coun-
sel for both parties in the presence of the jury, the court
directed the question to be read, and the witness answered,
"I cannot." On motion to exclude the answer the court
said it was proper, but later said, "Strike it." After repe-
tition of the question in different forms, and suggestions by
the court as to its form and elements, it was again asked,
"Did you find any property of this character for sale at
any price in this neighborhood?" and the witness an-
swered: "I maybe could get something if the real estate
man wouldn't laugh at me when I came and wanted it
cheaper than $12,000; that is what I had experience." On
motion that the answer be stricken out, counsel for re-
spondents said: "Strike that all out; that is enough." After
that occurrence, counsel, with the court, went into judge's
chambers, where, as it is said in the brief of appellant, a
motion was made by petitioner to withdraw a juror. What
transpired in chambers this court is not informed by the
abstract of the record, but the motion was denied, and the
court returning to the bench said, "That last answer—about
the real estate man would laugh at her—that may be
stricken out of the last answer." Other questions of like
character and remarks of counsel upon objection to evi-
dence are in the record. No good purpose would be served
by further quoting them.

In the argument, after thanking the jury for its courte-
ous attention to the case and expressing his interest in pub-
lic schools, counsel for respondents said: "Remember, it
is not a case of property owners trying to sell their prop-

erty. It is not a case of their trying to get the best price
for their property regardless. It is a question of these
property owners in their homes being told by the city, 'We
want your property; we want it for schools, to be sure, but
we want your property; we are going to take it; you must
surrender it to us.' Now, gentlemen, unless you give
these property owners what the property is worth, it is be-
ing taken without just compensation. I think the court
will instruct you that these property owners are entitled to
be neither richer nor poorer as a result of this lawsuit.
They are entitled to be financially in the same position as
they were on November 8, 1923, when the city of Chicago
filed this petition in court and decided that this property
was needed by the city of Chicago. I do not mean to tell
you that it is incumbent upon the board of education or the
city of Chicago to go and get these people another home,
but I do say that it is incumbent upon the city of Chicago
and the board of education to give these people enough
money so that they will be financially as well off after this
litigation as of November 8, 1923, as they were before.
Now, gentlemen, put yourselves in their position. In or-
der that you may be financially in the same condition—
that you may be neither richer nor poorer—the money
which you get in place of that home—which stands in place
of it—must be enough money so that you can get the same
kind of home that you had before; not any better nor any
worse, but the same kind of a home that you had before.
If you do not get the same kind of a home that you had
before; if you get a poorer one in a poorer neighborhood;
if you get one with poor transportation—one that is not in
as good condition, one that has not the advantages that these
homes have,—then I think you will agree with me that
your property has been taken without just compensation."
Objection being made to the argument, the court said,
"Well, strike it out." Continuing, counsel said: "A man
who lives in his house as a home, in order that he may

be neither richer nor poorer must have considerable more money to make him whole on November 8, 1923, than he needed prior to that time, and that is something to be remembered. * * * There is no argument on the question of schools. The question is not in this case whether we should have schools or whether we should not have schools. The matter whether property is worth $6000 or $12,000 makes a paltry difference in the matter whether we will have schools or not, but it makes a vital difference—it makes all the difference in the world—to these people who are being deprived of their homes. I use that word advisedly, because condemnation proceedings mean that the State, rather than the city, comes and takes their homes away."

It is contended that the court erred in permitting improper argument, improper conduct of counsel for respondents, and in not granting a new trial. These alleged errors are so intimately related that they will be considered together. If there is merit in the first two contentions, that embraced in the third follows necessarily, for it was the duty of the court to grant a new trial.

The record discloses a wide range in the testimony as to the value of the lots sought to be condemned. The aggregate of values stated heretofore suggests that great caution should be exercised in accepting the value placed on the several lots constituting the aggregate. Divergence in testimony as to values is frequent, as the trial of cases of this character shows, and this experience is confirmed by the decided cases. The only purpose of a trial as to value is to ascertain the just compensation guaranteed to the owners of the property sought to be appropriated to public use. Everyone holds his property subject to the right to have it so appropriated if the necessity arises. The guaranty of just compensation and the right to take upon making just compensation are correlative. Just compensation means the payment of such sum of money as will make the owner

whole, so that on receipt of the compensation he will not be poorer by reason of his property being taken. (*Phillips v. Town of Scales Mound,* 195 Ill. 353; *Metropolitan West Side Elevated Railway Co.* v. *Stickney,* 150 id. 362.) The measure of compensation is a sum of money that is the equivalent of the value of the property. That means such a sum as the property would sell for cash under ordinary circumstances, assuming that the owner is willing to sell and the purchaser willing to buy. (*Phillips* v. *Town of Scales Mound, supra.*) But this standard does not mean, nor must it be understood as implying, that where the owner is not willing to sell recourse must be had to some other standard. Indeed, it very often occurs that in condemnation proceedings the owners are averse to selling. Assuming that one is willing to purchase, as in this case, but the owner is unwilling to stipulate a price that the condemnor believes represents the value of the property, the inquiry is, What is the fair cash market value of it? The rule is not different from that applied where one obtains property of another without an agreed price. He must pay the fair cash market value for it, or what it is reasonably worth.

In cases of this kind, where the evidence is conflicting and the verdict is within the range of the testimony, courts will not interfere with the finding of a jury as to the amount of damages for the property taken unless there is something in the record showing that they have been influenced by passion or prejudice in reaching their verdict or that there has been some incorrect ruling of law by the trial court which might have misled them. (*City of Chicago* v. *McGowan,* 324 Ill. 164; *Sexton* v. *Union Stock Yard Co.* 200 id. 244; *Forest Preserve District* v. *Barchard,* 293 id. 556.) The aggregate values placed upon the property by the witnesses and by the jury have been stated. The lots separately were valued by the jury, lot 1 at $9000, lots 2, 4, 5 and 6 at $8000, and lot 3 at $8500. A representative value placed by one of petitioner's witnesses was, lot 1 at

$6600, lot 2 at $5800, lot 3 at $6200, lot 4 at $5800, lot 5 at $5900, and lot 6 at $6100. By one of respondents' witnesses values were fixed, lot 1 at $14,596, lot 3 at $13,334, lot 4 at $11,967, and lots 2, 5 and 6 each at $12,097.

It is apparent from the environment and proceedings at the trial that the state of the evidence requires comparative freedom from prejudicial error with regard to the admission of evidence and control of counsel by the court in the argument and conduct of the trial. It is the duty of the court to restrain counsel for both parties within proper bounds. Failure to do so, if a new trial is denied, will work a reversal of the judgment and impose a hardship on the parties. When counsel asked a witness for petitioner, he having testified that $6000 was a fair price for one of the lots, "Do you think it would be much help to them [the respondents] if they were out on the street with $6000 looking for a home?" the court should have interposed even if no objection was made. When counsel asked the same witness, "I want to know what you are going to do with these property owners when they get the $6000 and ousted from their home; what are you going to give them in its place?" the objection to it should have been promptly sustained and counsel warned of the consequences of pressing the improper question further, but the objection was sustained only to the comparatively innocuous part, "about being ousted." The objection to the question should have been sustained and the jury directed to disregard it. The speech by counsel in support of the question added to, rather than detracted from, its impropriety. When requested by petitioner to direct the jury to disregard the remarks the court should have done so then instead of postponing action. If included in an instruction, after other proceedings, it would lose its force as an admonition to disregard it. Equally obnoxious and prejudicial was the question asked the witness Mrs. Smith, a party to the suit. Objection to it was not ruled on, but when repeated by direction of the court

the witness answered, "I cannot." The court, on motion to exclude the answer, said in the presence of the jury that he thought it was proper. Later he said, "Strike it." The error in overruling the objection could be only partially cured by directing the jury to disregard it, but the direction to "strike it" meant nothing—the court should have directed the jury to disregard it. The culmination of the question, repeated in different form, was the statement by the witness as to her experience in trying to get property in that neighborhood for less than $12,000. On motion of counsel for petitioner that the answer be stricken, counsel for respondents said, "Strike that all out; that is enough." The harmful purpose of the question had been accomplished—counsel was satisfied; but after the conference in judge's chambers the court added force to the harmful suggestion embraced in the question and answer by directing that the part of the answer, "if the real estate man wouldn't laugh at me," be stricken. The ruling left the improper evidence before the jury.

The argument in the paragraph next before the last of counsel's address to the jury emphasizes the harmful fallacy running through the case. While the court ordered it stricken, the ruling was insufficient to overcome the numerous errors preceding it and of which it was a part. More insidious still is the last paragraph quoted. It admits of no other interpretation, in view of the entire proceeding before the jury, than that whatever the property is worth,—$6000 as testified by witnesses for petitioner or $12,000 as testified by respondents' witnesses,—the difference is paltry so far as the school district is concerned but "it makes all the difference in the world" to those losing their homes. The suggestion intended for the jury was that petitioner could pay $12,000 as easily as $6000. The State—not the city—"comes and takes their homes away." The implication is, the State is able to pay. But that was not the issue. The suggestion of autocratic sovereign action

in "taking their homes away" was not without design. The tendency and evident intention were to prejudice the jury in favor of the citizen as against the State. The question what was the fair cash market value of the property on the 8th day of November, 1923, was evaded or placed in obscurity, without restraint, by respondents. That question was not tried and a verdict reached upon a fair consideration of the facts that the jury were authorized to consider.

Appellees contend that as there is no assignment of error that the verdict is excessive, appellant cannot complain on account of the amount of the verdict. That is true. If error were assigned that the verdict is excessive and no prejudicial error had intervened, and if the verdict were within the range of the testimony, this court would not interfere with the finding of the jury. (*City of Chicago* v. *McGowan, supra.*) To affirm the judgment rendered upon the record here might be justly construed as approval of the conduct of counsel as well as of the action, or rather inaction, of the court upon objections and motions tending to obviate error during the progress of the trial. Under a series of decisions of this court, if the court had admonished counsel to keep within the record and instructed the jury to disregard the offensive remarks, or had directed any control against the conduct complained of, some reason for affirming the judgment might be found, but nothing of even that mild nature was directed toward obviating the effect of error. To pass *sub silentio* the facts calling for decision upon manifest errors open to review would admit of no interpretation other than that this court does not disapprove of them. It is not possible to say to what extent the jury were influenced by them. They were evidently intended to influence the jury. The beneficiaries should be permitted to take nothing by them. Appellant was entitled to a fair trial in conformity with the principles governing fair trials.

The judgment of the circuit court is reversed and the cause remanded for a new trial.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Crow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded.*

FARMER and STONE, JJ., dissenting.