(No. 36841.—

PEOPLES GAS LIGHT AND COKE COMPANY, Appellee, *vs.* ROSCOE C. BUCKLES *et al.,* Appellants.

*Opinion filed March 23, 1962.—Rehearing denied May 23, 1962.*

WEBBER, BALBACH & THIES, of Urbana, for appellants.

Ross, McGOWAN & O'KEEFE, of Chicago, and BARTH, PHILIPS, PHEBUS & TUMMELSON, of Urbana, (CLARENCE H. Ross, JOSEPH M. WELLS, PHILIP A. McKINSEY, and DARIUS E. PHEBUS, of counsel,) for appellee.

Mr. JUSTICE SOLFISBURG delivered the opinion of the court:

This matter involves a suit by the plaintiff gas corporation to condemn a subsurface geological strata under the land owned by the defendants for the purpose of storing gas underground. The condemnation suit did not seek the fee-simple title to the property but only the right to inject and withdraw gas from the St. Peter geological formation lying under the 160 acres of the defendants' land. The trial court directed a verdict awarding the defendants the sum of $4000 as just compensation for the taking of this underground strata. From this judgment defendants appeal directly to this court. Ill. Rev. Stat. 1959, chap. 47, par. 12.

It appears from the record that on March 21, 1960, the plaintiff filed a petition with the Illinois Commerce Commission for an order granting the plaintiff a certificate of public convenience and necessity for the testing, development, operation and maintenance of an underground gas-storage reservoir near the village of Mahomet, pursuant to the Illinois Public Utilities Act (Ill. Rev. Stat. 1959, chap. 111⅔, par. 50, 56) and the Gas Storage Act (Ill. Rev. Stat. 1959, chap. 104, pars. 104, 105). The initial hearing before the Commerce Commission was set for April 21, 1960, notice was sent by registered mail to the record owner of each privately owned tract of land in the storage area against which eminent domain was to be exercised, and notice was given by publication in a newspaper of general circulation, more than 21 days prior to the April 21, 1960, hearing. Pursuant to such notices, hearings were held before the Commerce Commission and on July 29, 1960, an order was entered by the Commission finding that there was reasonable expectation that the St. Peter geological formation in the vicinity of the village of Mahomet had a dome type of structure at approximately 1,650 feet below the surface, which might be utilized for the injection, storage and withdrawal of large quantities of gas. The dome-like structure covered approximately 23,000 acres with the primary area of somewhat less than 5000 acres at the crest of the structure which was to be the area for the initial development as a pilot or test operation. The order of the Commission made findings as to the nature of the geological structure; the absence of coal, gas, oil or mineral deposits in any commercial quantities; that notices had been sent to all land owners whose lands were to be subjected to condemnation; that the use of the gas-storage reservoir will not injure any water resources and will be confined to a geological stratum lying more than 500 feet below the surface of the soil; that the natural gas which is proposed to be stored would be used for ultimate dis-

tribution to the public in the city of Chicago and that the public convenience and necessity of a substantial portion of the gas-consuming public in the State of Illinois will be served by such gas-storage project. The order of Commission grants to the plaintiff under section 55 of the Public Utilities Act a certificate of public convenience and necessity to test, develop, construct, operate and maintain a gas-storage project and approves, under and pursuant to the provisions of the Natural Gas Storage Act, the development, construction, operation and maintenance of the underground natural gas-storage reservoir on a pilot operation. The order provides certain restrictive conditions protecting the rights of the owners of lands within the boundaries of the storage area and the public resources of the State, and for the carrying of public liability insurance.

No appeal was taken from the order of the Commission and thereafter on October 18, 1960, the plaintiff filed the present action in the circuit court of Champaign County. The complaint alleged that plaintiff was a public utility and had obtained an order from the Commerce Commission authorizing an under ground storage project in the vicinity of the village of Mahomet in Champaign County involving some 4,390 acres and that the plaintiff had acquired, by voluntary grant, the necessary rights to enable it to undertake the underground storage of gas from the owners of the land lying within the test storage area, except as to the 160 acres belonging to the defendants and prayed that the court ascertain and assess the compensation to be paid to the defendants and that plaintiff have the right, privilege and easement to develop and conduct the gas-storage operation under such land.

Following the issuance of summons against the defendants and the disposition of certain motions, pretrial discovery and preliminary matters, the case came on for trial and the plaintiff introduced evidence that the defendants operated the 160 acres as a farm for the raising of

grain and livestock, that it was improved with the usual farm buildings, that it was located in a rural farming area and that no oil or gas had ever been produced in the area.

The plaintiff also presented the evidence of three expert real-estate appraisal witnesses who each testified as to the value of the farm before taking and the value after taking, showing that there was a loss in value of $4000. By stipulation plaintiff agreed that its activities would be confined to the subsurface strata of the St. Peter formation and would not involve any part of the surface of defendants' land.

The defendants attempted to introduce evidence that the highest and best use of the property was for the purpose of underground storage of gas and proposed through expert witnesses to show the value or worth of the underground storage easement was approximately $300,000, and that the taking of the easement diminished the value of the defendants' land in that amount. The defendants' evidence to this effect was rejected by the trial court after an extensive series of offers of proof and the trial court directed a verdict, since the only competent evidence which had been allowed to be introduced showed damages to the defendants by reason of the subsurface easement of $25 per acre. Judgment was accordingly entered on the verdict for $4000.

The defendants, appellants in this court, raise numerous grounds for reversing the judgment of the trial court. Basically, these fall into four principal categories. First, the matter of "jurisdictional proof" (as defendants characterize it) as a prerequisite for the taking of defendants' land. This involves the validity of the order of the Commerce Commission and an asserted lack of certain other "jurisdictional requirements." Second, the constitutionality of the Gas Storage Act of 1951. (Ill. Rev. Stat. 1959, chap. 104, pars. 104 *et seq.*) Third, errors of the trial court relating to rulings on continuances, discovery and the plead-

ings which defendants contend denied them due process of law. Fourth, the exclusion of all evidence of value offered by the defendants with the withdrawal of the case from the jury and the direction of a verdict.

Concerning defendants' objections to the judgment of the lower court because of the lack of so-called "jurisdictional proof," their first contention is that the condemnation petition does not refer expressly to the statute which authorizes plaintiff to exercise eminent domain. There is no merit to this contention. The complaint states that the right to enter upon and take or damage private property is conferred by the Public Utilities Act and the Gas Storage Act when ordered or authorized by an order of the Commerce Commission. Attached to the complaint is the order of the Commerce Commission which specifies not only the statutes but even the particular sections of the statutes under which the plaintiff proceeded. In determining whether a petition for condemnation sufficiently alleges the statutory requirements for condemning property, the Commission's order attached to the petition as an exhibit must be considered in adjudging the sufficiency of the petition. (*City of Chicago* v. *Central National Bank,* 5 Ill.2d 164, 173.) Nor is there merit to the defendants' contention that the project authorized by the Commerce Commission is only a pilot or experimental phase. *Wilcox* v. *Commerce Com.* 23 Ill.2d 432.

We likewise find no substance to the position of the defendants pertaining to the plaintiff's failure to negotiate in good faith. We are of the opinion that an adequate attempt to acquire the property right by negotiation was made by plaintiff. A final letter offering defendants $45 per acre for storage rights was sent to the defendants and no response thereto was received. While such an attempt is sufficient to show adequate negotiation, (*Public Service Co. of Northern Illinois* v. *Recktenwald,* 290 Ill. 314, 317; *County Board of School Trustees* v. *Batchelder,* 7 Ill.2d

178, 182,) plaintiff's land agent also personally contacted the defendants. It is true that the instrument which the plaintiff first sought the defendants to execute was broader than the ultimate right condemned, in that it involved possible damage to, and entry upon the surface of defendants' land. Nevertheless, on this record, we think plaintiff has shown a good faith attempt to negotiate. The wide spread between the offering price of the plaintiff and the demand of the defendants, based on their differing theories of value for the storage rights, shows that no practical solution could have been reached through further negotiation.

Next defendants urge that the enabling order of the Commerce Commission is void because it is not supported by the requisite findings. However, orders of the Commerce Commission which are within its statutory authority are not void but voidable only, (*People ex rel. Illinois Highway Transportation Co.* v. *Biggs,* 402 Ill. 401, 409; *Chicago, Burlington and Quincy Railroad Co.* v. *Commerce Commission. ex rel. Brotherhood of R. R. Trainmen,* 364 Ill. 213, 222) and such orders are not subject to collateral attack. (*Illini Coach Co.* v. *Commerce Com,* 408 Ill. 104, 110; *Chicago North Shore and Milwaukee Railroad Co.* v. *City of Chicago,* 331 Ill. 360, 375; *Valier Coal Co.* v. *Department of Revenue,* 11 Ill.2d 402, 409.) The defendants in this case were notified of the Commerce Commission proceedings but did not take part therein nor contest the order of the Commission by direct appeal. They cannot now collaterally attack the order. Besides, we have recently had occasion to examine, on a direct appeal, an order of the Commerce Commission authorizing an underground storage project as a prerequisite for exercising condemnation. (*Wilcox* v. *Commerce Com.* 23 Ill.2d 432.) The findings in the instant order of the Commission are in substantial accord with those which we approved in the *Wilcox* case. The stipulations which plaintiff filed do not alter the order of the Commission nor do they demonstrate any lack

of findings. Such special conditions could have been included in the Commission's order had defendants participated in the proceedings before the Commission.

Neither do we find the Gas Storage Act of 1951 unconstitutional. It is not special nor local legislation. (*People ex rel. Dencen* v. *People's Gas Light and Coke Co.* 205 Ill. 482, 494.) The right of eminent domain is part of the sovereignty of the State and may be conferred by the legislature upon particular kinds of grantees in the public interest, while withholding it from other types of persons or corporations. (Nichols, Eminent Domain, 3d ed. sec. 4.15; 17 I.L.P. 181, 195, Eminent Domain, secs. 5, 14; *Western Union Telegraph Co.* v. *Louisville & Nashville Railroad Co.* 258 U.S. 13, 21, 66 L. ed. 437.) This court held many years ago in *Public Service Co. of Northern Illinois* v. *Recktenwald,* 290 Ill. 314 at page 319: "It cannot be doubted that power may be conferred upon a corporation organized under authority of the General Assembly to serve the public by supplying the people with gas, electricity, heat and water, which can best be produced and distributed by such a corporation acting under State control, to take private property for the public uses of such corporation by the power of eminent domain."

. Nor is the Gas Storage Act an amendment by reference to the Public Utilities Act in violation of section 13 of article IV of the constitution. A careful examination of its provisions clearly shows that it is a complete and independent legislative enactment. Its application is limited to the acquisition by eminent domain of property rights for underground storage of gas, (*Wilcox* v. *Commerce Com.* 23 Ill.2d 432) and such storage projects are for a public purpose.

Whether underground storage rights could also be acquired through eminent domain by virtue of section 59 of the Public Utilities Act, where the Commission has ordered or authorized improvements under section 50 of that act,

as contended by plaintiffs, we need not specifically decide.

The next category of defendants' objections deals with the denial of due process in violation of constitutional rights because of the rulings of the trial court upon pretrial matters. While defendants list some 17 supposed "arbitrary actions" by the trial court which "constitute the denial of due process" they fail, in most cases, to point out wherein the ruling was erroneous other than being adverse to them. Rulings on continuances and most of the matters contained in defendants' "specifications" were discretionary with the trial court and no abuse of discretion is shown. Furthermore, the request of the defendants and the rulings of the trial court in many of the complained-of instances relate to the theory of damages sought by the defendants and which we discuss later. As to the constitutional point of denial of due process, however, we have held that neither an abuse of discretion nor an erroneous rule of law as to damages or the refusal to admit evidence or grant continuances will support a reversal for violation of due process. (*Chicago Land Clearance Com.* v. *Darrow,* 12 Ill.2d 365, 369; *Fairbank* v. *Stratton,* 14 Ill.2d 307, 318.) Moreover, procedural due process is not a guarantee against erroneous or unjust decisions nor protection against the incorrect construction of statutes or rules of law. *Genslinger* v. *New Illinois Athletic Club,* 332 Ill. 316, 319; *Standard Motors Securities Corp.* v. *Yates Co.* 337 Ill. 250, 252; *Illini Coach Co.* v. *Commerce Com.* 408 Ill. 104, 111.

We next turn to defendants' primary argument and the basic issue in this proceeding, namely, the proper measure of damages to be used in determining the compensation payable to the defendants for impregnating with gas a subsurface strata lying under their land. The decision on this issue will determine the correctness of the trial court's rulings on the admissibility and refusal of evidence and whether or not the defendants, by the directed verdict, were denied their right of trial by jury.

The measure of damages in a condemnation proceeding is "just compensation" and this is generally determined by the fair market value of the property taken. (17 I.L.P. 233, Eminent Domain, sec. 61; *Central Illinois Public Service Co.* v. *Lee,* 409 Ill. 19, 26; *Chicago Land Clearance Com.* v. *Darrow,* 12 Ill.2d 365, 372.) Market value is to be measured in view of any and all uses to which the property may be applied or adapted, (*Crystal Lake Park Dist.* v. *Consumers Co.* 313 Ill. 395, 402,) or as oftentimes said "for its highest and best use upon the date that the condemnation petition is filed." (*City of Chicago* v. *Equitable Life Assurance Society,* 8 Ill.2d 341, 345; *City of Chicago* v. *Giedraitis,* 14 Ill.2d 45, 49.) However, such value cannot be based upon speculation and conjecture, such as an anticipated profit or possible income from the property. (*City of Chicago* v. *Giedraitis,* 14 Ill.2d 45, 51; *Chicago Land Clearance Com.* v. *Darrow,* 12 Ill.2d 365, 373; *City of Chicago* v. *Central National Bank,* 5 Ill.2d 164, 175.) And although the question of market value may be one of fact to be proved as any other fact, (*Trunkline Gas Co.* v. *O'Bryan,* 21 Ill.2d 95, 98), yet, what constitutes "market value" is a question of law and not of fact. *City of Chicago* v. *Farwell,* 286 Ill. 415, 419; *Crystal Lake Park Dist.* v. *Consumers Co.,* 313 Ill. 395, 402.

As we stated in *Housing Authority of East St. Louis* v. *Kosydor,* 17 Ill.2d 602 at 605-6. "Definitions of 'just compensation' have ranged from 'the amount of money necessary to put him in as good condition financially as he was with the ownership of the property' (*City of Chicago* v. *Koff,* 341 Ill. 520, 527-28) to 'a sum of money that is the equivalent of the value of the property.' (*City of Chicago* v. *Cunnea,* 329 Ill. 288, 295.) But despite differences in definition, the applied measure of just compensation has been constant. The value to the owner of the property taken or damaged for his particular purposes, or its value to the condemnor for some special use, have been rejected in favor

of the 'market value' of the property at the highest and best use to which it is adapted. (*City of Chicago* v. *Harrison-Halsted Building Corp.* 11 Ill.2d 431; see Symposium, Methods of Establishing 'Just Compensation' in Eminent Domain Proceedings in Illinois, Ill. Law Forum 1957, pp. 289-308.) This objective standard has been adopted in most jurisdictions. (McCormick on Damages, sec. 129.) Generally, exceptions occur only when property has special capabilities which make it unmarketable at its true value due to unique improvements, such as a church, a school or a railroad terminal. 4 Nichols, Eminent Domain 133, sec. 12.32; *City of Chicago* v. *Farwell*, 286 Ill. 415; *City of Chicago* v. *Harrison-Halsted Building Corp.* 11 Ill.2d 431."

While these general rules are applicable to the present case, there are no decisions in Illinois, and, so far as we have been able to determine, none in other jurisdictions, involving the condemnation of an underground gas-storage reservoir. Consequently, the measure of damages applicable to the taking of a subsurface geological formation is one of first impression. Moreover, gas-storage fields have been the subject of experimentations for several years and some have proven successful while others have not. There is no certainty that the Mahomet field will be successful. The order of the Commerce Commission merely finds that the St. Peter formation may be suitable and that a pilot operation may "prove the soundness of the Galena-Plattsville cap-rock and to provide performance data on the St. Peter storage formation."

To understand the problem we must initially determine the nature of the taking. Plaintiff's petition sought, and the judgment of the court gave the plaintiff the right, privilege and easement to introduce gas into the St. Peter geological strata and to store gas in such formation with the right to remove such gas with any water vapors absorbed. No taking of the fee or damages to the surface of the land is involved. Plaintiff's taking amounts to no more than an

easement, and the usual measure of damages payable to such cases is based upon the diminution of the fair cash market value of the property burdened by the easement. *North Shore Sanitary Dist.* v. *Schulik,* 12 Ill.2d 309, 312; *Central Illinois Public Service Co.* v. *Lee,* 409 Ill. 19, 26.

We know of no factors or considerations involved in the condemnation of an easement for the underground storage of gas which requires it to have a different measure of damages than the customary measure of damages for easement acquisition. It is difficult for us to see how a commercially valueless salt-water-filled sandstone formation 1600 feet below the surface and which is unusable by the defendants, can take on any added value by virtue of a possible special use unavailable to them. However, if defendants' theory of damages is applicable, it should apply whether plaintiffs were seeking to condemn the whole (fee simple) of plaintiff's property or just the easement, since the defendants' theory is that the highest and best use of the property is specifically as a gas storage reservoir.

The evidence which defendants sought to introduce and the offers of proof made by defendants were based on the valuation of a successfully operating gas-storage field. Defendants offered the testimony of petroleum engineers who had prepared figures of the possible amount of gas which could be stored in the Mahomet field, assuming that it would be as capable as anticipated, and which showed that a reasonable development of the field would produce a future net revenue of $238,777,500 which was then discounted to obtain a present-day worth of $59,453,228 with the proportionate share of defendants' farm evaluated at $413,616. Other witnesses offered by defendants were prepared to testify that the highest and best use of defendants' land was for underground storage of natural gas and that the land for that purpose was worth $250,000 to $300,000 and, after the easement taking, it would be worth from $50,000 to $100,000, so that the damage to the defendants' land

was in the neighborhood of $200,000. The lower court rejected these offers of proof. The plaintiff introduced evidence of value by customary methods. As an adverse witness, George Buckles testified that the 160-acre farm was used in a grain and livestock operation, was improved with usual farm buildings and that there had never been any oil or gas produced and that he knows of no oil or gas under the land. Plaintiff also presented the evidence of three expert real-estate appraisal witnesses who testified as to the value of the farm before the taking of the easement and the value after the easement, with a determinaton of $4000 as being the difference or the burden of the plaintiff's easement. Two of the real-estate witnesses testified as to the sales of the fee of other tracts in the area during 1959, 1960, and January of 1961, at prices ranging from $500 to $600 per acre, and some of these sales were after the seller became aware of the gas-storage possibilities. The defendants' land was valued at $500 per acre.

While, as we have already noted, there are no specific decisions dealing with the condemnation of underground storage rights, there are some analogous situations in the water reservoir and hydro-electric power project cases. In *United States ex rel. TVA* v. *Powelson,* 319 U.S. 266, 87 L. ed. 1390, the Government condemned the respondent's land which was on a non-navigable stream. The respondent had, for a period of almost 30 years, been acquiring lands for constructing an integrated 4-dam hydro-electric project on the Hiwassee and Nottely Rivers which were tributaries to the Tennessee River. It was the respondents' theory that the value of his lands condemned by the Government for its Tennessee Valley project included its potential as a hydro-electric project. They sought to establish a value of $7,500,000 upon the assumption that the estimated cost of the 4-dam project would be $30,000,000 with an annual output of 512,500,000 kilowatt hours of energy at a production cost of 3.75 mills per kilowatt hour and a selling

price of 6.34 mills, which, on as assumed net return, was capitalized so that the allocated part of the project to the lands in question was $7,500,000. (A theory similar to the defendants' offer in this case.) Not only did respondent in that case have a large part of the land already acquired but also had the power of eminent domain, yet the court held that the value of the potential hydro-electric reservoir could not be considered. At page 285, the court held: "The result is that respondent's privilege to use the power of eminent domain may not be considered in determining whether there is a reasonable probability of the lands in question being combined with other tracts into a power project in the reasonably near future. If the power of eminent domain be left out of account, the chances of making the combination appear to be too remote and slim 'to have any legitimate effect upon the valuation.' *McGovern* v. *New York,* supra (229 U.S. 372, 57 L. ed. 1232, 33 S. Ct. 876, 46 LRA (NS) 391). Respondent therefore has not established the basis for proof of the water power value which was asserted. * * * Respondent is, of course, entitled to the market value of the property fairly determined. And that value should be found in accordance with the established rules." In reaching this conclusion, the court said, pages 281-2: "It is a well settled rule that while it is the owner's loss, not the taker's gain, which is the measure of compensation for the property taken [Citations], not all losses suffered by the owner are compensable under the Fifth Amendment. In absence of a statutory mandate * * * the sovereign must pay only for what it takes, not for opportunities which the owner may lose. See Orgel, Valuation Under Eminent Domain 1936, § 71, § 73. On the one hand are such cases as *Monongahela Nav. Co.* v. *United States,* supra, where it was held that the United States had appropriated a going enterprise to its own ends and must make compensation accordingly. But it is well settled in this Court that, 'Frustration and appropriation are essentially different

things.' *Omnia Commercial Co.* v. *United States,* supra (261 U.S. 513) * * *."

We have also held that frustration of an anticipated return need not constitute a compensatory element in a condemnation case. *Housing Authority of East St. Louis* v. *Kosydor,* 17 Ill.2d 602, 608.

In *McGovern* v. *New York,* 229 U.S. 363, 57 L. ed. 1228, the city of New York sought to condemn land for use as a reservoir to obtain an additional supply of water. The land belonging to McGovern was among many parcels taken and the question arose on the refusal to admit evidence as to the exceptional value of the land for a reservoir site. The offer was made "to prove the fair and reasonable market value of this piece of property taking into consideration that element of value which gives it an enhanced value because it is part of a natural reservoir site." The New York courts had sustained the refusal of this offer of proof and in an opinion by Justice Holmes that action was affirmed. At page 372 it was stated: "The enhanced value of the land as part of the Ashokan reservoir depends on the whole land necessary being devoted to that use. There are said to have been hundreds of titles to different parcels of that land. If the parcels were not brought together by a taking under eminent domain, the chance of their being united by agreement or purchase in such a way as to be available well might be regarded as too remote and speculative to have any legitimate effect upon the valuation. See *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U.S. 226, 249 * * *."

We recognize that there may be special cases where the property is exceptionally adapted and available for a particular use which should be taken into consideration in fixing the value. See: *United States* v. *Chandler-Dunbar Water Power Co.,* 229 U.S. 53, 57 L. ed. 1063; *Mississippi and Rum River Boom Co.* v. *Patterson,* 98 U.S. 403, 25 L. ed. 206; *Illinois Light and Power Co.* v. *Bedard,* 343

Ill. 618; *Decatur Park District* v. *Becker,* 368 Ill. 442. However, in each of those cases the property in question did not need to be combined with numerous other tracts in order to make it adaptable to the particular use which was determinative of the measure of damages.

*Olson* v. *United States,* 292 U.S. 246, 78 L. ed. 1236, involved damages to the lands bordering Lake of the Woods in Minnesota; and Olson, as the owner of some of that land, sought damages based on the value of the storage of water being made available for generation of power. The lower court instructed the jury that they "will not make an award based on any claim for reservoir value." This action was approved by the Supreme Court, stating at pp. 256, 260, and 261: "The use of shorelands for reservoir purposes prior to the taking shows merely the physical possibility of so controlling the level of the lake. But physical adaptability alone cannot be deemed to affect the market value. There must be a reasonable possibility that the owner could use his tract together with the other shorelands for reservoir purposes or that another could acquire all lands or easements necessary for that use. * * * When regard is had to the number of parcels, private owners, Indian tribes and sovereign proprietors to be dealt with, it is clear that there is no foundation for opinion evidence to the effect that it was practicable for private parties to acquire the flowage easements in question. * * * On the facts shown, it conclusively appears that there was no element of value belonging to petitioners that legitimately could be attributed to use and adaptability of their lands for reservoir purposes. The evidence covered by petitioners' offers was inadmissible. The court rightly excluded reservoir uses from consideration."

In this case defendants' position relies on the "physical adaptability" of their land or what might be called the "strategic location" of their property. In *United States* v. *Chandler-Dunbar Water Power Co.* 229 U.S. 53, the court

specifically rejected any value due to the fortuitous location of the property, stating at page 80: "It is not proper to attribute to it any part of the value which might result from a consideration of its value as a necessary part of a comprehensive system of river improvement which should include the river and the upland upon the shore adjacent. * * * The 'strategic value' for which $15,000 has been allowed is altogether speculative."

Neither is there a "reasonable possibility" that the defendants could use their land together with the other lands necessary for a gas-storage field. Such a project not only depends on the putting together of some 5,000 acres, the minimum for the pilot operation of Mahomet, but also the obtaining of a certificate for the project from the Commerce Commission. The argument of defendants that other utilities had expressed interest in the availability of an underground storage area and, therefore, there is "marketability" to the under ground storage rights in the defendants' 160 acres, is without merit. Before any utility could operate a gas-storage project an order granting a certificate of public convenience and necessity would be required even though no condemnation was involved. (*Wilcox* v. *Commerce Com.* 23 Ill.2d 432.) It also seems wholly impracticable, if not impossible, for a regulatory body to grant more than one certificate to operate a gas-storage field in the same location. We cannot conceive of how the Commission could grant the plaintiff a certificate to operate a storage field in the St. Peter strata under the defendants' land and also grant to another utility the same right. While usually a certificate of public convenience and necessity only permits a limited monopoly and is not exclusive, yet there are certain times and types of operation in the utility field where certificates may be mutually exclusive. (*Ashbacker Radio Corp.* v. *Federal Communications Com.* 326 U.S. 327, 90 L. ed. 108.) Consequently, the grant of a certificate to one would exclude the possibility of a grant to another.

Therefore, the marketability of defendants' lands for a gas-storage reservoir rests not only on a combination of other parcels but also on the grant of a certificate of public convenience and necessity, which makes any potential value from such use too remote and speculative for consideration in a condemnation proceeding. (See: *United States* v. *Virginia Electric & Power Co.* 365 U.S. 624.) Adding to the speculative character of the defendants' theory of value is their own contention that the order of the Commission is only for an experimental operation to test the feasibility of making Mahomet an operational storage field. Defendants' testimony on value could only be based on a possibility and therefore was wholly conjectural.

We do not consider *City of Chicago* v. *Sexton,* 408 Ill. 351, to be applicable to the case at bar. There the condemnor sought to take the air rights over a piece of property in the heart of Chicago by constructing a viaduct over it. The evidence of value offered in the *Sexton* case was the standard type based upon sales of other property in the immediate locality and was not speculative or remote.

Furthermore, at the very heart of defendants' position is the fact that the St. Peter sandstone formation under the defendants' land achieves value solely because it is a part of the certificated storage project of the plaintiff and, therefore, runs headlong into a well established rule in determining values, *i.e.,* that no consideration is to be given to the value to the condemnor for some special use. (*City of Chicago* v. *Harrison-Halsted Building Corp.* 11 Ill.2d 431, 440; *Housing Authority of East St. Louis* v. *Kosydor,* 17 Ill.2d 602, 608.) "The question is what has the owner lost and not what has the taker gained." (*Boston Chamber of Commerce* v. *City of Boston,* 217 U.S. 189, 194, 54 L. ed. 725.) The taking of a salt-water-filled sandstone strata lying some 1600 feet below the surface of the defendants' land would not appear to be of substantial monetary loss to the defendants. See also, *City of New York* v. *Sage,*

239 U.S. 57, 69 L. ed. 143, where it was held that the value to the condemnor of a piece of land combined with other parcels cannot be used as a guide to the compensation to which the owner is entitled. Neither can defendants' position be compared with the unitization of property for the recovery of oil. Defendants are not claiming a value for the loss of the salt water under their land. The plaintiff is not taking any oil or minerals from the defendants' property but is merely occupying a porous strata in the ground which is not adapted and available to any use by the defendants or any other reasonably potential purchaser. The only case which we have found pertaining to a subsurface taking is *United States* v. *Kansas City Life Insurance Co.* 339 U.S. 799, 94 L. ed. 1277, and there the under-surface invasion destroyed the surface use of the land and was as destructive as if the land had been submerged. Here, the surface is not being disturbed or damaged. Again, the query must be what have the defendants lost and not what has the plaintiff gained.

We are, therefore, of the opinion that defendants' theory of value for their property was remote and speculative and the trial court was correct in rejecting the defendants' offer of proof. Where the theory of value of the property is dependent on too many contingencies and is too uncertain, the trial court does not err in excluding such evidence. *Chicago Land Clearance Com.* v. *Darrow,* 12 Ill.2d 365, 373.

Since the offered testimony was properly excluded, the only competent evidence submitted to the jury was that the fair cash market value of the easement burden was $25 per acre or $4,000. Consequently, the court properly directed a verdict in that amount. (*City of Chicago in Trust for Schools* v. *Riley,* 16 Ill.2d 257, 264.) See also, *Trunkline Gas Co.* v. *O'Bryan,* 21 Ill.2d 95, where we held that the lower court properly directed a verdict on the cross petition after properly excluding testimony by which the defendant

sought to prove damages to lands lying outside the easement strip.

We, therefore, conclude that the judgment of the circuit court of Champaign County was correct and it is affirmed.

*Judgment affirmed.*