Frederick B. Bryant, J.
This action was instituted by the Home G-as Company pursuant to ECL 23-1303 for the condemnation of underground storage rights in the Oriskany sandstone formation beneath the surface of the defendants’ farm in Schuyler and Yates Counties. By order of this court dated November 5, 1969 such condemnation was authorized and commissioners of appraisal appointed.
Defendants are the owners in fee of 94.77 acres of land in the Town of Tyrone, Schuyler County and the Town of Barrington in Yates County. This property is located in the Wayne portion of what is referred to as the Wayne-Dundee gas field. This field was at one time an active natural gas producing area but has in recent years been used mainly for the storage of natural gas brought in by pipeline from southern United States gas fields. The area consists of an underground layer of porous material known as Oriskany sandstone which lies approximately 1,800 feet beneath the surface of the defendants’ property.
The condemnation order decreed that, subject to determination of damages, the plaintiff was entitled to take title to the following interests in the defendants’ property: 1. The underground layer of Oriskany sandstone beneath the defendants’ property for so long as the plaintiff and its successor in interest shall continue to .store gas in the Wayne-Dundee storage field. 2. Any commercially recoverable native gas and oil in place in such subterranean area. 3. An abandoned gas well, with the right to plug and abandon such well, and a right of way across the surface of defendants’ property for such purpose. At the hearing it was stipulated that the right of way had already been used for this purpose and that the well had, in fact, been plugged and abandoned.
The commissioners spent nine days in hearings extending over a period of 22 months. On December 18, 1973 they filed *28 their report awarding a total of $20,361 to the defendants as damages for the taking of the underground storage rights and for gas and oil in place. Such damages included $1,025 for the abandoned well and right of way above referred to and $5,120 for commercially recoverable native gas.
The defendants now move to confirm the award. The plaintiff seeks an order rejecting the award and setting it aside on the grounds of irregularity and excessiveness.
In its final award the commissioners broke down the elements of damage as follows:
Market value of property with gas storage
rights ............................ $28,432
Market value of commercially recoverable
native' gas in place.................. 5,120
$33,552
Market value after condemnation....... $14,216
Loss in market value.................. $19,336
Stipulated value of abandoned well...... 1,000
Rental value of temporary easement .... 25
Total $20,361
For the reasons set forth herein the court concludes that the award must be rejected and set aside and that the issue of damages must be retried before new commissioners unless the defendants shall stipulate to accept a lower amount.
The court is mindful of the limited power which it has in reviewing the decision of commissioners of appraisal in condemnation cases. This power is defined in Matter of Huie (2 N Y 2d 168), in the following language (p. 171): “'The power of the courts to review an award of the commissioners is strictly limited, and every intendment is in favor of the action of the commission (Adirondack Power & Light Corp. v. Evans, 226 App. Div. 490, 493). The Supreme Court at Special Term cannot modify their award, but must either confirm or reject their report (Administrative Code, §§ K41-16.0, K41-23.0). This is not the case of a review by the court of a verdict of a jury (Adirondack Power & Light Corp. v. Evans, supra). The courts will reject a determination of the commissioners only for irregularity in the proceedings, or if based on an erroneous principle of law (see Matter of City of New York [Northern Blvd.], 258 N. Y. 136, 155), or, if it1 shocks not only one’s sense *29 of justice, but one’s conscience ’ (Matter of City of New York [Old Third Ave.], 241 App. Div. 13, 16, appeal dismissed 265 N. Y. 503; see Adirondack Power & Light Corp. v. Evans, supra; Matter of Huie [Merrill-City of New York], 306 N. Y. 951; Matter of Cibulas v. Village of Menands, 266 App. Div. 895).”
Thus the court recognizes the power of the commissioners to accept or reject expert testimony and their right to base their determination of value on their own knowledge and. observation. But the authorities do not support an assumption by the commissioners of unrestrained power to arbitrarily determine, the amount of damages to be awarded. In this respect they are in a position similar to that of trial jurors and must find some support for their decision in the evidence. They must determine fair market value on some foundation other than speculation and must follow the rules with reference to what constitutes fair market value as established by the courts..
The commissioners have valued the underground storage rights taken by the plaintiff at $150 per acre. This amounts to 50% of the total market value of the farm found by the commissioners. In the opinion of this court such valuation is so excessive that it shocks the court’s, conscience and sense of justice. (City of Troy v. Manufacturers Nat. Bank, 30 A D 2d 889.) The court is also of opinion that the valuation thus established is not supported by the evidence. Further, the court .finds that the evidence before the commissioners does not support an award for commercially recoverable native gas in place at the time of taking. It is also the court’s opinion that interest has been improperly allowed from 1963 instead of from the date of the award.
VALUATION OP UNDERGROUND STORAGE RIGHTS
While this action to condemn subsurface gas storage rights is a ease of first impression in New York State,, the value of such rights has been established by the courts of other States in accordance with the same rules which prevail here. In Milby v. Louisville Gas & Elec. Co. (375 S. W. 2d 237 [Ky.]), a Kentucky court reversed an award of $140 per acre as excessive. In Peoples Gas Light & Coke Co. v. Buckles (24 Ill. 2d 520), the Illinois court found an award of $25 per- acre for such rights to be proper, while in Midwestern Gas Transmission Co. v. Mason (31 Ill 2d 340), the same court affirmed a finding of the commissioners that such rights had no value to the owner.
Each of these cases recognized and applied well-established principles of law with reference to the valuation of property *30 taken in condemnation which appear to this court to have been overlooked by the commissioners in this proceeding.
In determining the question of damages it is important to keep in mind what is being taken. The Wayne-Dundee area was for many years a gas producing area. All of the comparable sales and leases relied on by the expert appraisers and by the commissioners reflect this fact. These comparable sales included operating rights, rights to drill and extract gas and oil, rights to lay pipeline, to install compressor equipment and the like. Apparently the days of gas and oil production in this field are over. The sandstone formation is empty of economically recoverable gas. But it still has a use, however limited.
Hence the only property right being taken in this case is the right to inject and store natural gas in the Oriskany sandstone beneath the defendants’ farm and to withdraw it for customer use. This right is something the defendants cannot use. It can be acquired and used only by a company which has obtained a license from the State of New York entitling it to conduct such operations. Only one such company can use such storage area at a time. The right is to continue only so long as such storage is utilized. The owner of the farm is not giving up valuable oil, gas or surface rights. His surface area is not affected. He is simply giving up space which he can in no way use and which has only a limited rental value.
Thus, in determining damages, the fair market value of those underground storage rights to the owner is the crucial issue. This basic principle — that the value for condemnation purposes is value to the owner and not value to the taker — seems to have been overlooked by the commissioners and undoubtedly resulted in the high value they placed on the gas storage rights. (See Board of Hudson Riv. Regulating Dist. v. Cady, 131 Misc. 768; McGovern v. New York, 229 U. S. 263; United States ex rel. T. V. A. v. Powelson, 319 U. S. 266; City of New York v. Sage, 239 U. S. 57, 61, where the court said: “ But what the owner is entitled to is the value of the property taken, and that means what it fairly may be believed that a purchaser in fair market conditions would have given for it in fact — not what a tribunal at a later date may think a purchaser would have been wise to give, nor a proportion of the advance due to its union with other lots.”)
In Olson v. United States (292 U. S. 246, 256, 257) the claimant sought to enhance his damages based on the value of his property for storage of water available for generation of power. In rejecting this basis of valuation the court said: ‘1 But physical *31 adaptability alone cannot be deemed to affect market value. There must be a reasonable possibility that the owner could use his tract together with the other shore lands for reservoir purposes or that another could acquire all lands or easements necessary for that use,, ’ ’
It is the plaintiff’s contention that the highest and best use of the defendants’ property is for crop and dairy farming and that taking the underground storage rights has in no way affected such use. The defendants’ appraiser and the commissioners found that the highest and best use is for both farming and gas storage. In reply to this the plaintiff urges that there is no such use to the defendants for storage purposes since they are not in a position to make use of such facilities.
It is true that the highest and best use of a property taken in condemnation must be one of which the owner is in a position to take advantage. See Matter of City of New York (34 N Y 2d 535) in which the contention that the highest and best use of the property for a shopping center was not supported by proof of economic feasibility.
While the property being condemned here is usable for underground gas storage, it is not so usable by these owners. It does have a value for rental or sale which has been established by previous transactions in the Wayne-Bundee field. (Note the two Illinois cases, supra. In one there was no proof of any prior transactions and hence no value shown.) Thus, the highest and best use of this property is for farming and also for lease or sale of underground storage rights — not for use as underground storage itself.
In Matter of East Riv. Gas Co. of Long Is. City (119 App. Div. 350, affd. 190 N. Y. 528), an award had been made for lands of the City of New York underwater and under Wards Island which were acquired for the building of a tunnel. In setting aside the award, the court said (p. 353): ‘1 In arriving at any estimate of the value to the owner the commissioners were also required to take into account the availability and adaptability in the hands of such owner of the property taken for particular uses and purposes. ’ ’ [Emphasis supplied.]
In Matter of Niagara, Lockport & Ontario Power Co. (133 Misc. 177) the claimant argued that the value of his property should be considered as a part of a power development on the basis of its joinder with two adjoining projects. In rejecting this contention the court held that the landowner was not entitled to compensation merely by reason of the fact that the land was peculiarly adapted to the use for which it is taken.
*32 The commissioners rejected the opinion of Vredenburg, the plaintiff’s appraiser, that, the fair market value of the defendants’ property before the taking was $15,400 as too low; they criticized the valuation found by the defendants’ appraiser of $350 per acre as confusing and inconsistent. They then established the value of the property before taking at $28,432. Not only is there no support in the record for such an arbitrary figure, there is complete lack of support for the value of $14,216 after the taking of the storage rights. What the commissioners have held, in effect, is that this farm, purchased and used primarily for farming purposes with incidental underground storage rights, useless to owners, is worth only $14,216 as a farm while such useless storage rights are of equal value to the owners. Such a finding is unconscionable.
The commissioners seem to have made the same basic error in reaching their valuation of the property as did the.defendants’ appraiser. That is, they have added to the value of the defendants ’ property as a farm their opinion of the value of the storage rights to the taker. This was held to be error in Matter of Huie (1 A D 2d 500), where the court held that the proper measure of compensation is the difference between fair market value of the land before taking and the fair market value of any part remaining after taking. While it is proper to consider the existence of an underground storage area as a factor bearing on fair market value, the commissioners are really attempting to place ja, value on the storage rights somewhere close to the highest price that the plaintiff would be willing to pay for such rights. (See City of New York v. Sage, 239 U. S. 61, supra.)
The plaintiff’s expert appraiser, Vredenburg, concluded that the fair market value of the defendants’ farm was $15,500 and that the taking of the underground storage rights caused damage of $20 per acre, or $2,900. Vredenburg made a detailed analysis of 196 sales in the Wayne-Dundee area. These sales included gas production as well as gas storage rights. He relied on a few sales which, in his opinion, were closest to the present proceeding. While the commissioners criticize him for averaging 15 sales to reach a valuation of $20 per acre they overlook the obvious point that Vredenburg used these only as corroboration for the establishment of the $20 per acre figure throughout the field. By whatever means of transfer — lease, deed or agreement— all of Vredenburg’s sales data pointed to the damage figure of $20 per acre. While it is true that this figure was established largely because plaintiff was the only purchaser of gas storage rights, this does not dictate complete rejection. Jn *33 fact, it is tMs very limited market in itself which brings about a lower market value for defendants’ property than might otherwise be the case. It is this court’s opinion that the commissioners simply failed to fully analyze the Vredenburg testimony.
The commissioners also held that Vredenburg actually gave an indication of a higher value of the gas and gas storage rights in two of his comparables. Again, the commissioners failed to distinguish between condemnation of gas rights and gas storage rights. The $62 per acre differential in the foregoing com-parables included gas production rights, active wells and extensive rights to lay pipelines and install equipment.
Vredenburg’s comparables bear a closer relation to the property being taken in this proceeding than do those of the defendants’ appraiser and demonstrate an actual market value far below the arbitrary figure .set by the commissioners. Thus, in five specific transactions, outlined in Exhibit 5, and in Vredenburg’s testimony we find illustrative sales in which gas storage rights range in market price from $8.85 per acre up to $20 per acre. And Vredenburg has in each case made proper adjustments to make them comparable to the rights being acquired here. Sales set forth in Example 5, pages 19, 38, 42 and 69 give a clear picture of market values in the Wayne-Dundee storage field both before and after disposal of storage rights. Of course, the commissioners were free to disregard the testimony of this expert or of any other expert. But Vredenburg’s analysis of market values was so extensive that its complete rejection is not only .shocking but it is all the more so when the commissioners on their own and with no competent evidence to support their conclusion adopted a value per acre seven times as great as that established by Vredenburg. Vredenburg’s evidence tends to establish a real market value. The commissioners’ conclusions ténd rather to reward the defendants for refusing to voluntarily sell at such established value. This is not the purpose of eminent domain.
The defendants’ real estate appraisal was characterized by the commissioners as confusing and inconsistent. Yet it is apparent that great reliance was placed on the appraiser’s conclusions. It is the opinion of this court that it should have been totally rejected.
First, the appraiser made no adjustments in comparing the appraisal properties with the subject property. This was not only contrary to accepted principles of good appraisal practice and of law (Latham Holding Co. v. State of New York, 16 N Y 2d 41) but was very important in this case. The rights being *34 taken here are limited to storage rights. Yet the comparables used by the defendants ’ appraiser concerned rights to drill and |o extract gas and oil.
The defendants’ appraiser went so far as to establish a fictional property consisting of acreage, storage area, four active wells and rights to gas and oil. He then used this fictional property to establish a value for the subject property. This was clearly error.
Further, to arrive at a value for the fictitious parcel, the defendants’ appraiser resorted to the technique of averaging the established prices of several parcels, a practice clearly contrary to law. (Latham Holding Co. v. State of New York, supra; Ridgeway Assoc. v. State of New York, 32 A D 2d 851.)
It is this basic error of not making proper comparables that makes the Andrews appraisal so unreliable. An examination of the two transactions on which the appraiser’s opinion rests will demonstrate this error.
The Houck lease to Home Gas Co. was for $200 per year plus an amount of free gas. The defendants’ appraiser capitalized this at $51 per acre. But no adjustments were made to adapt this transaction to the situation here. In the present case only storage rights necessary to plaintiff’s operation are being condemned. The Houck lease covered all oil and gas in place, drilling rights, the right to inject and store gas and the right to lay and maintain pipelines. These rights were much more extensive than the rights with which this proceeding is concerned. They were more than “ rights ” — they included tangible property and a disturbance of the surface area. And even if the figure of $51 per acre for storage rights alone were adopted, there is certainly no basis for the appraisal figure of $300 per acre for such rights which Andrews suggests.
The sale from Olszewski to Home Gas Co. is subject to the same comment. This deed conveyed all gas as well as storage rights and included three operating wells, the right to use the surface, lay pipe, drill wells. The fact that the grantee also agreed to pay $3,000 for each new well drilled is some indication of the value of wells as compared to storage rights. And even here the price paid was $71 per acre — far from $300.
Andrews also based his appraisal on the theory that the rights being condemned were to meet the needs of the condemnee, that is, on their value to the taker rather than the owner. This was error.
Andrews also adopted a theory that since a well could be used on each 25 acres in the Wayne-Dundee field, a typical farm for *35 comparison purposes would consist of 100 acres with four wells. And he testified that in his judgment the company taking the underground rights should also pay for such wells even though they were not present and not needed.
While the commissioners purport to have rejected Andrews’ testimony, it is noted that their report states that their award is within the range of that testimony. The Andrews figures were so high that it was error to have considered them as the outer limit for such range. There was thus no range of testimony and the only evidence of fair market value in the record was that of the plaintiff.
RECOVERABLE NATIVE GAS
The award for commercially recoverable native gas in place is not supported by the evidence. On this question, as on all questions of valuation, the burden of proof rests on the claimants — the defendants here. (Matter of Board of Educ. of Union Free School Dist. No. 22 Towns of Oyster Bay and Babylon, 216 N. T. S. 2d 811.) The defendants have not met this burden.
Storage gas was first injected into the Wayne sector of the Wayne-Dundee field in 1958. Since that date and for a continuous period of 12 years to 1970, storage gas from southern gas fields has been injected and withdrawn annually. If it could be assumed that each year all gas injected for storage was withdrawn for customer use, there would certainly be no gas, native or otherwise, in place in 1970. But the experts all agree that there must be cushion gas in the storage area to provide basic pressure for withdrawal of injected gas. That being the case, such gas is still there and will still be there when the plaintiff or its successors finally surrender their rights to store gas in this area. Hence, this gas is not being withdrawn and is not commercially recoverable.
But even if it be assumed that such gas is commercially recoverable, the question remains whether “ native ” gas was in place at the time of taking. There is nothing in the record to indicate that in 1970 when the property was taken pursuant to condemnation the gas in place was anything other than injected gas or an indefinable mixture of the original native gas and the gas injected over the years since 1958. There is thus no basis for any award for taking of commercially recoverable native gas in place.
It may be true that native gas was taken in 1958 when the plaintiff first used the storage area. That is a question of fact, as is the question of the monetary damage, if any, sustained by *36 the defendants by such taking. Those issues are a part of the counterclaim in this action which has been severed and which concerns itself with the damage, if any, sustained by the defendants due to the plaintiff’s storage activities from 1958 to 1970.
The commissioners rely on the testimony of Daniel G-. Klinger for their finding that there was commercially recoverable native gas in place at the time of taking. But Klinger’s testimony has been misinterpreted. After first explaining that the gas in place was at a pressure so low that a vacuum process was needed to extract any of it, Klinger stated that such recovery was not “ economically ” feasible. Certainly nothing is undertaken “ commercially ” that is not at the same time “ economically ” worthwhile. It is further noted that Klinger’s testimony did not relate to any gas in place at the time of taking but to gas supposedly present in 1936.
Harley ¡Crandall did produce and market gas from the Wayne sector from 1936 to 1958. Perhaps some of this was commercially recoverable native gas. Or, as urged ¡by the plaintiff, it may have been injected gas ¡which migrated from the Dundee field. But there is no proof that in 1970 any such commercially recoverable native gas remained under the defendants’ surface area. '
The holding in Iroquois Gas Corp. v. Gernatt (50 Misc 2d 1028, affd. 28 A D 2d 811, affd. 22 N Y 2d 694) lis clearly to the effect that “ commercially recoverable ” means feasible in a business sense to undertake the recovery of the native gas in place. All the evidence here is to the contrary.
Iroquois Gas Corp. v. Gernatt (supra) also rejects the argument that “ cushion ” gas is commercially recoverable gas since it is necessary to the storage operation and thus has value. The court stated (p. 1035): “ As to damages, the test is not whether the native gas in place has any ¡value to the operator of a storage facility but whether it has any value to the owner of the land. ’ ’
One of the issues to which much testimony related was the question of whether the Wayne-Dundee storage area consisted of two fields or one. It was the early belief of1 operators in the field that there were, in fact, two areas separated by a natural barrier. Experts at a later date, for reasons developed in the testimony, concluded that the fields were, in fact, connected into one field. !
The plaintiff produced testimony to establish the existence of one field. This was contradicted by testimony -from the defendants ’ expert who maintained that the fields were separate. At *37 one point in the course of the proceedings the commissioners indicated that they were prepared to hold that the storage area was, in fact, one field. Although no further testimony on this issue was brought out, the commissioners never made a forms ruling on the question and in their report they .state that tb - entire issue is academic and not pertinent to this claim.
The court fails to understand how this important issue could have been so carelessly dismissed. The question as to whether there were one or two fields had a crucial bearing on the question as to whether there was commercially recoverable native gas in place in the Wayne field. The commissioners, in finding that there was such gas in place, point to the operation of Harley Crandall during the nineteen thirties and forties and the pressures indicated when he surrendered his rights to the plaintiff. But it has been the plaintiff’s contention from the beginning that the gas which was being sold by Crandall and the gas which remained in the field when he left was, in fact, gas injected by the plaintiff in the Dundee portion of the field which migrated to the Wayne sector. Had the commissioners finally adopted the ruling they stated they were prepared to make, this issue would have been conclusively settled in favor of the plaintiff. And had it been decided that there were, in fact, two fields it might have given some support to their final determination that there was native gas in place although, as discussed above, the burden of proof on this issue was never met.
Even if the finding of the commissioners that there was a quantity of commeróially recoverable native gas in place at the date of taking was supported by the evidence, their method of valuing such gas is purely speculative.
As said before, “commercially” recoverable means more than simply recoverable by any means. It is the equivalent of “ economically” recoverable. This implies that not only must the gas be present in the ground, but that its extraction be commercially feasible. Wells must be drilled and installed, complete with casings and other equipment. Pipelines must be available. There must be a market for the product. Depreciation and operating costs must be calculated. All of this involves expense. Nowhere in the record is there any proof as to the cost of such removal. Nowhere is there any proof as to the actual market value of the gas at the point where it is deliverable on a commercial basis. In fact, there is evidence that because of the low pressure in the field the extraction of the gas would be by vacuum process and thus more costly than normal. The commissioners have apparently made up some *38 figures as to market value of gas from some source outside the record.
This case is similar in that respect to Dillenbeck v. State of State York (193 Misc. 542) where the court rejected speculative testimony concerning the commercial value of a peat deposit.
VALUATION DATE AND INTEREST
The Home Gas 'Company first began storing gas in the Wayne-Dundee storage field in ¿940. Prior to the commencement of such storage and thereafter they acquired interests in this field, including storage rights and gas production rights. In 1957 and 1958 Home Gas Company began to acquire rights in the Wayne section of the field, where the defendants’ property is located, and first injected gas in this area in 1958. At that time they had acquired no rights to gas storage in that portion of the Wayne sector lying beneath the surface of the defendants’ farm and bargaining for the acquisition of such rights failed.
In 1963 the Legislature enacted section 86 of the Conservation Law which is now ECL 23-1303. This section enabled licensed gas storage operators to acquire underground storage rights by eminent domain. Certainly one purpose of this statute was to enable a gas storage operator to store gas in a storage field without being subjected to suit by any one owner of property in the field who, by enjoining storage under the surface of his property, could effectively thwart the entire .storage operation. After failing to reach an agreement with the defendants for the acquisition of such rights, Home Gas Company commenced this proceeding to take them by condemnation.
Defendants interposed a counterclaim to the condemnation proceeding in which they seek damages for trespass and for the taking of native gas between 1958 and the date of the action. By order of (Mr. Justice Brink this counterclaim was severed and has been .set down for separate trial. Presumably, any award made to the defendants on that counterclaim will include damages for use of their property from 1958 until the date the storage rights passed by the condemnation order, together with damages for any native gas found to have been removed.
The date, therefore, for the fixing of damages in this proceeding is the date when title to the rights condemned passed to the plaintiff, to wit, November 5, 1969. That is the date for fixing the market value of the rights taken and the value of any commercially recoverable native gas in place. Interest on the award should commence as of the date that the commissioners made their award, to wit, December 17, 1973. Any damages for tak *39 ing prior to November 5, 1969 are to be determined at the trial of the defendants’ counterclaim. (Matter of Manhattan Ry. Co. v. Comstock, 35 Misc. 326 [Interest assessed from time award is made]; Matter of Board of Water Supply of City of N. Y., 277 N. Y. 452 [Compensation measured as of date of taking]; Taggarts Paper Co. v. State of New York, 230 N. Y. 622 [Award based on value as of date of taking. Interest allowed from date of award]; Matter of Van Etten v. City of New York, 226 N. Y. 483 [Time of acquisition of title is the time at which right to compensation and its amount accrued. It is the divesting of title which entitles to compensation]; St. Patricks Church v. State of New York, 30 A D 2d 473 [Claimant’s right to compensation measured as of the time of taking when its damage has become accrued and fixed].)
In the present proceeding the commissioners have awarded interest on their award from 1963 on some theory of a de facto taking at or before that time. It is this court’s opinion that such finding is erroneous.
oorroLxrsioir
The provisions of law permitting condemnation of underground gas storage rights are designed to enable a public utility to acquire from a property owner the facilities needed to further its operations. At the same time it was designed to assure the property owner compensation for the fair market value of the rights taken. On the whole record in this ease it appears to this court that the commissioners have been more concerned with compelling the plaintiff to pay a penalty for the acquisition of these underground storage rights on the basis of their value to the taker than in fairly compensating the owner.
It is, therefore, the conclusion of the court that the award of the commissioners herein should he rejected and set aside and a new trial ordered before new commissioners unless, within 10 days from entry of the order herein and service thereof on the attorney for the defendants with notice of entry, the defendants agree to accept the sum of $3,000 as full compensation for the rights taken in this proceeding, including the abandoned well and temporary easement.
The commissioners also reported that the defendants are entitled to the additional 5% of the award authorized by section 16 of the Condemnation Law. Whether to make such an allowance is purely a function of the court. This court does find, however, that in this case such additional award should be allowed.