D.B. CORKEY COMPANY, INC., Plaintiff-Appellant, v. ALFRED N. KOPLIN *et al.*, Defendants-Appellees.

Second District No. 2—87—0854

Opinion filed December 1, 1988.

Sharon H. Rice and Glen H. Kanwit, both of Hopkins & Sutter, of Chicago, and Gary L. Taylor, of Rathje, Woodward, Dyer & Burt, of Wheaton, for appellant.

Richard S. Huszagh and Theodore A. Shapero, both of Rudnick & Wolfe, of Chicago, for appellees.

JUSTICE DUNN delivered the opinion of the court:

Plaintiff, D.B. Corkey Company, Inc., brought suit against defendants, Alfred N. Koplin, Jean V. Koplin, and Caroline Koplin, seeking to recover a real estate brokerage commission allegedly owed to plaintiff. Plaintiff claimed that it had produced a ready, willing and able buyer for property owned by defendants, but that defendants refused to consummate the transaction or pay the commission. The circuit court of Du Page County granted defendants' motion for summary judgment finding that no brokerage agreement existed between the parties. The issue on appeal is if a material question of fact exists as to whether there was a brokerage contract, either express or implied in fact, under which plaintiff is entitled to a commission. For reasons set forth below, we affirm.

From our review of the record, including the depositions filed in support of and in opposition to the motion for summary judgment, we have gleaned the following facts. Donald Corkey (Corkey), president of the plaintiff corporation, is a licensed real estate broker specializing in commercial transactions. Alfred Koplin (Koplin) and his wife, Jean, own eight office buildings and one apartment building, which are located in Oak Brook, Hinsdale, and Elmhurst. The Koplins' daughter, Caroline, is beneficiary of a trust holding title to one of the properties; Alfred Koplin has the power of direction to sell all of the properties and manages the properties. Corkey and Koplin met during the course of lease transactions involving the Koplin properties. In those transactions, Corkey represented tenants. He did not represent defendants or receive a brokerage commission from them.

Corkey testified at his deposition that in June 1984, at the conclusion of a lease transaction, Koplin raised the issue of a possible sale of the properties. Observing that Corkey seemed to represent some "heavy hitters," Koplin asked Corkey if he thought any of them would be interested in buying the properties. Koplin said he had recently turned down $50 million and wanted approximately $52 million. They discussed the various properties and Corkey said he would "see what was going around." According to Corkey, this was the entirety of the June 1984 conversation.

The parties' next contact was in November 1984. Corkey testified that Koplin called and said he wanted to sell the property for $54 million. Corkey said that Koplin suggested to Corkey, " 'Why don't you put a 5% commission on top of that?' He said, 'I don't care what you get.' " Up to this point, no written brokerage contract had been entered into, nor had Corkey told Koplin he was acting as defendants' broker.

On November 5, 1984, Corkey sent a letter to Koplin introducing an investment analyst for the Travelers Insurance Corporation, which Corkey identified as "my client." The letter stated that plaintiff would be entitled to a commission of 5% of a "Net" price established by Koplin payable at closing. The letter concluded: "If the foregoing is acceptable, please sign where indicated below and return a copy for my files." Koplin did not sign the letter or return it to Corkey.

In early 1985, Corkey contacted the Holladay Corporation regarding the potential sale of the Koplin properties. Prior to the transaction at issue here, Corkey had acted as a real estate broker for Holladay on other occasions. He had received commissions from Holladay in those instances and was also a limited partner in a partnership whose other partners were Holladay's employees. Corkey testified that he was actively looking for property on Holladay's behalf. After some initial correspondence between the parties, in which Corkey referred to Holladay as his clients, defendants indicated that they were interested in selling only one property at a time. Because Holladay was only interested in buying all of the properties at once, discussions between the parties temporarily ceased.

Negotiations concerning the properties resumed in June 1985. Although the parties dispute who initiated the contact, Koplin informed Corkey that defendants still might be interested in selling all of the properties together. A meeting was then arranged among Corkey, Koplin, and officers from Holladay. Although Koplin denied reaching an agreement during the meeting, Corkey testified that Koplin and one of Holladay's officers, Richard Haase, shook hands on a deal that would yield $52 million net to defendants.

Prior to this meeting, Corkey sent two letters to Koplin. One purported to reinstate Holladay as a potential buyer and to register plaintiff as broker "in the event a sale [was] consummated with [Holladay]." No means of accepting this proposal, as was included in the earlier letter regarding Travelers Insurance, was provided. The second letter indicated Holladay's interest in buying the properties and requested a letter of intent which would be subject to "our review" of certain documents requested in the letter. Once again, Corkey re-

ferred to Holladay as his client throughout both letters. John Phair, another Holladay officer, whose deposition is a part of the record here, testified that prior to Corkey sending these letters, Corkey had asked to represent Holladay again. Phair also testified that he and Corkey had negotiated over the amount of the commission, that Corkey was acting as Holladay's broker, and that the commission would be paid by Holladay. Koplin was not a party to these negotiations.

After the meeting, Holladay's attorney prepared a draft contract of sale. Holladay delivered the contract, which called for a sale price of $51 million, along with a $100,000 earnest money check, to Corkey for him to present to Koplin. Koplin did not sign the draft contract, and Corkey returned the check to Holladay. Corkey and Koplin then sat down and discussed the proposal, with each making comments and handwritten notations on it. The notations indicated that the purchase price would be $53,750,000, the net price Koplin was seeking. Notations also reflect an increase in the earnest money deposit. Paragraph 15 of the draft contract originally provided that defendants would pay a commission to plaintiff as set forth in a separate written agreement between Corkey and Koplin. This provision was manually crossed out, and the word "Revise" was written in the margin. Corkey testified that the proper arrangement regarding his commission had not been conveyed correctly to Holladay's attorney and that Holladay was to pay the commission. Corkey conveyed the substance of his conversations with Koplin to Holladay.

On September 3, 1985, Corkey forwarded to Koplin a letter of intent executed by Phair on behalf of Holladay. The letter stated that the anticipated contract would provide for a feasibility period during which Holladay would have the opportunity to review documentation and have the right to terminate the contract if it was not satisfied with its inspections. Koplin did not execute this letter of intent. Instead, he sent Holladay a letter confirming that $53,750,000 would be an acceptable price but that neither party would be obligated until a contract was executed. He also wrote that Holladay was to pay any brokerage commission. Koplin's attorney also sent a letter to Holladay's attorney setting forth various terms acceptable to Koplin and suggesting that the parties meet so as to proceed to contract.

On November 12, 1985, Corkey sent another letter of intent to Koplin for him to sign. The letter, signed by Corkey on behalf of Holladay, outlined the essential elements of the transaction. Corkey requested Koplin's signature, but again, Koplin did not sign it. Arrangements were made, however, for a November 15 telephone conference among Koplin, Koplin's attorney, Phair, and Corkey.

Corkey testified that during the conference, Phair and Koplin verbally agreed that they had a "deal" and that Koplin's attorney would prepare a contract for signatures. The agreed price was $53,750,000 net to the Koplins, and the brokerage commission of 4.6% of the purchase price would be paid by Holladay. Although Phair testified that there were no terms left to be agreed upon, Koplin testified that the parties did not discuss the amount of down payment or whether there would be any prorations to the purchase price.

After the conference, Koplin's attorney prepared a draft contract for Koplin to sign. Koplin objected, however, because the contract contained a provision for prorations of taxes and security deposits rather than calling for the "net" price agreed upon during the conference. Disagreement over prorations and documentation to be furnished by Koplin eventually led to a breakdown of negotiations, and Koplin never executed the draft contract.

On December 11, 1985, after negotiations had reached an impasse, Corkey sent Koplin an invoice for services rendered in connection with the sale of the properties. The letter stated that Koplin had a listing contract with plaintiff and that plaintiff had fulfilled its obligations under the contract by producing a ready, willing and able buyer. When Koplin refused to pay, plaintiff filed the instant suit. The initial two-count complaint alleged in count I that plaintiff was entitled to the commission and in count II that defendants had tortiously interfered with an agreement between Holladay and plaintiff under which plaintiff would manage the properties after Holladay purchased them. Plaintiff later amended the complaint to add a third count alleging tortious interference with plaintiff's brokerage contract with Holladay. As noted above, the trial court granted defendants' motion for summary judgment as to count I and dismissed counts II and III for failure to state valid claims. On appeal, plaintiff argues that the trial court erred in granting summary judgment for defendants on count I because the record establishes the existence of a brokerage agreement between the parties. Plaintiff does not appeal the dismissal of counts II and III.

■■ ■ The law regarding summary judgment is well settled. A motion for summary judgment shall be granted if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c).) Such a motion and its supporting documents must be construed strictly against the movant and liberally in favor of the opponent. (*In re Estate of Whittington*

(1985), 107 Ill. 2d 169, 177.) While summary judgment is a drastic measure which should be allowed only when the right of the moving party is free from doubt (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240), it is also to be encouraged in the proper circumstances as an aid in the expeditious disposition of a lawsuit. (*Allen v. Meyer* (1958), 14 Ill. 2d 284, 292; *Holbrook v. Peric* (1984), 129 Ill. App. 3d 996, 998.) While a party opposing a motion for summary judgment is not required to prove his case at that stage, he must present some factual basis that would arguably entitle him to judgment in his favor. *Fuller v. Justice* (1983), 117 Ill. App. 3d 933, 939.

■■ ■ The parties do not dispute that in order to recover a commission under a contract theory, plaintiff must prove the existence of a brokerage contract between himself and defendants. (*Bau v. Sobut* (1977), 50 Ill. App. 3d 732, 737.) No particular form of contract is necessary; all that is required is that the broker act with the consent of his principal, which may be written, oral, or implied by the conduct of the parties. (*Arthur Rubloff & Co. v. Drovers National Bank* (1980), 80 Ill. App. 3d 867, 871.) In whatever form, however, a broker's contract is governed by the law applicable to ordinary contracts. There must be a meeting of the parties' minds through offer and acceptance, and the contract must be definite in its terms. *Rubloff*, 80 Ill. App. 3d at 871; *Bau*, 50 Ill. App. 3d at 737.

Plaintiff first argues that an express oral brokerage contract arose from discussions between Corkey and Koplin. Plaintiff points to their first conversation in June 1984, in which Koplin mentioned that he was aware plaintiff represented "some heavy hitters." During that meeting Koplin expressed interest in selling the properties for approximately $52 million, and Corkey said he would see if any of his clients would be interested in buying. Plaintiff also points to the November 1984 conversation between Corkey and Koplin during which Koplin indicated that he would be interested in selling the properties for $54 million and that plaintiff should add 5% to that price for his commission. Relying on *Otto Real Estate, Inc. v. Shelter Investments* (1987), 153 Ill. App. 3d 756, plaintiff maintains that Koplin made an offer of a unilateral contract during those conversations which plaintiff accepted by producing a ready, willing and able buyer.

In *Otto*, an owner of real estate contacted the plaintiff and told him it would pay a $50,000 commission or finder's fee if plaintiff found a buyer for two pieces of property at a specified aggregate price. The plaintiff found a buyer for one of the properties, but the seller refused to pay a commission to plaintiff because both properties were not sold under the terms of the oral agreement. (*Otto*, 153 Ill.

App. 3d at 758.) The *Otto* court held that the seller's execution of a partial sale represented a new contract, implied in fact, under which the plaintiff could recover. *Otto*, 153 Ill. App. 3d at 761.

■ The trial court here rejected the applicability of *Otto* to the case at bar, and we likewise find *Otto* inapposite. The question in *Otto* was not whether an express oral contract had been created by the seller's explicit promise to pay a commission if the plaintiff produced a buyer. The only real issue was whether the existence of the express oral contract prevented formation of an implied in fact contract by the parties' conduct. (*Otto*, 153 Ill. App. 3d at 758-60.) *Otto* is therefore not controlling here. In contrast to the actions of the seller in *Otto*, there was no express promise by Koplin to pay a commission to plaintiff. Plaintiff admitted throughout his deposition that the parties understood that any commission on the sale would be paid by the buyer. Under these circumstances, no express contract arose between the parties.

■■ Plaintiff goes on to argue in the alternative that even if he is not entitled to recovery under an express oral contract, an implied-in-fact contract arose from the conduct of the parties. It is true that a brokerage contract may arise by implication from the actions of the parties. An implied contract, defendant points out, arises where a seller knows the broker is endeavoring to effect a sale and expects to receive compensation for his services, or where the owner encourages the broker to aid in the sale and leads the broker to believe he will receive compensation. (*Hodgman, Inc. v. Feld* (1983), 113 Ill. App. 3d 423, 429.) This principle is qualified, however, in that the broker must expect compensation from the owner, and the broker must be led to believe the owner will pay a commission. (*Zwikel v. W.F. Hall Printing Co.* (1972), 7 Ill. App. 3d 853, 857.) As the trial court noted here, the depositions on file, including Corkey's, belie the existence of an implied brokerage contract. The uncontradicted evidence is that defendants did not intend to pay a commission to Corkey and that Corkey would be compensated for his services by the buyer. Thus, Corkey did not expect to be compensated by defendants, leading us to conclude that no implied contract was formed.

■ We do not believe the cases relied on by plaintiff call for a different result. Although in *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, the court affirmed a jury finding that both a buyer and seller had impliedly consented to the broker acting as their agent (*Cole*, 36 Ill. App. 3d at 793), in that case there was no provision that the broker would look to one party or the other for his commission. Here, in contrast, everyone concerned understood that plaintiff would look exclu-

sively to the buyer for compensation. *Korman v. Wanen Catalpa Apartments, Inc.* (1959), 20 Ill. App. 2d 598 (abstract of opinion) also differs from the case at bar because there the implied contract was premised on the seller's express agreement to pay the broker a flat fee, while defendants here made no such promise. Although plaintiff also relies on the general rule that the seller is responsible for a broker's commission (*Webster v. Hochberg* (1969), 105 Ill. App. 2d 466, 477), this rule only holds true in the absence of a provision to the contrary. (*Webster*, 105 Ill. App. 2d at 477.) Here the parties explicitly and repeatedly provided that plaintiff would be paid by the buyers.

We conclude that the trial court properly found that the depositions on file contradict the existence of a brokerage contract between plaintiff and defendants. This conclusion makes it unnecessary for us to address defendants' argument that plaintiff would not be entitled to recover on any such contract. The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

LINDBERG, P.J., and INGLIS, J., concur.