LAKE COUNTY FOREST PRESERVE DISTRICT, Plaintiff-Appellant, v. FIRST NATIONAL BANK OF WAUKEGAN, as Trustee, *et al.*, Defendants-Appellees.

Second District   No. 2—89—0937

Opinion filed August 1, 1990.

Donald T. Morrison, of Donald T. Morrison & Associates, P.C., of Waukegan (Joseph T. Morrison, of counsel), for appellant.

Richards, Ralph, Eiden, Eckert & O'Donnell, Chartered, of Vernon Hills, and Roland A. Eckert, of Epton, Mullin & Druth, Ltd., of Chicago (Robert T. O'Donnell, of counsel), for appellees.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Lake County Forest Preserve District (the District), filed an eminent domain action in the circuit court of Lake County. The District sought to acquire by condemnation certain property belonging to defendants, First National Bank of Waukegan, as trustee of trust No. 3085, Swanson Farms Partnership, mortgagor and beneficial owner of the property held in trust No. 3085, Alan Richards and Michael L. Ralph, two of the partners of Swanson Farms Partnership, and Hamilton Financial Corporation, lien holder. Defendants filed a traverse and motion to dismiss, stating that the District failed to make a *bona fide* effort to agree with the defendants as to the just compensation to be paid for the subject property prior to the filing of the District's condemnation complaint. An evidentiary hearing was held on August 10, 1989. In its written order issued on September 7, 1989, the court granted defendants' traverse and motion to dismiss, finding that the District had not made "a good faith, *bona fide* attempt to agree on the purchase price for the land sought to be condemned."

The District appeals, raising four issues which can be effectively stated as one: whether the District made a *bona fide* attempt to reach

an agreement with defendants on the amount of compensation for their property.

■■ Illinois' Eminent Domain Act provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." (Ill. Rev. Stat. 1987, ch. 110, par. 7—101.) A condition precedent to the exercise of the power of eminent domain is an attempt to reach an agreement with the property owner on the amount of compensation. (*City of Oakbrook Terrace v. La Salle National Bank* (1989), 186 Ill. App. 3d 343, 351.) In this regard, the acquiring authority must make a *bona fide* attempt to agree, and the attempt must be made in good faith. (*Department of Transportation v. Walker* (1980), 80 Ill. App. 3d 1039, 1040.) Where a wide disparity exists between the value placed on the property by the acquiring authority and the property owner and where the circumstances show that no practical solution can be reached, no further negotiations are necessary. *Peoples Gas Light & Coke Co. v. Buckles* (1962), 24 Ill. 2d 520, 527-28; *Oakbrook Terrace*, 186 Ill. App. 3d at 351.

The subject property (parcel EF-5) consisted of approximately 19.66 acres of a 35-acre parcel. Defendants purchased parcel EF-5 in May 1986 for $280,000. Thereafter, parcel EF-5 in conjunction with the remainder of the 35-acre parcel was sold for $965,683.71 to Anvil Farms, a joint venture of which defendant Swanson Farms Partnership was a 50% owner with a corporation called Hamilton Development. Late in 1986, defendants began having informal discussions with the Village of Lincolnshire (Village) regarding the annexation of their 35-acre parcel to be developed as the Anvil Farms Subdivision. With future annexation in mind, defendants hired an engineer, a land planner, a tree surveyor, and other professionals to prepare preliminary plats of subdivision and other studies incident to approval by the Village for annexation. In July 1987 defendants were prepared to make their formal proposal for annexation and subdivision to the Village Board of Lincolnshire (the Board). Two of the defendants and their engineer appeared at the Board's July 23, 1987, meeting to make their presentation. However, at the meeting defendants learned that the District had expressed some interest in acquiring the Keough Properties, which included the subject property. As a result, the Board voted to defer any action on the defendants' request for annexation until the District's intent could be clarified.

In a letter, dated July 31, 1987, the District president, Donald Strenger, reported to the Village that the subject property had been brought to the attention of the District's land acquisition committee (the Committee) on July 10, 1987, that the property had been referred

to the administrative staff for preliminary study, that the staff study had not yet been considered by the Committee, and that no determination to recommend the property for acquisition had been made by the land acquisition committee or the District's finance committee. Defendants received a copy of this letter. In response, defendants sent a letter on August 5, 1987, to Strenger, requesting a definitive statement of the District's intent requiring acquisition of the subject property.

In a September 23, 1987, letter to the Village the chairman of the land acquisition committee explained the District's position stating:

"No motion to acquire these properties has been made by any member of the Land Acquisition Committee, and the matter is not scheduled for further consideration.

The prospective purchasers of the Keough Properties [which included the subject property] have been advised that they are free to seek annexation to the Village of Lincolnshire."

Defendants received a copy of this letter, and shortly thereafter the Village contacted defendants to inform them that they were now free to appear before the Board and resume their petition for annexation.

Between the time of receipt of the September 23, 1987, letter from the District and the District's October 25, 1988, notice of intent to acquire the subject property, defendants worked with the Village toward annexation and subdivision of the entire 35-acre parcel. The evidence at the hearing showed that prior to October 25 defendants prepared and revised the plat of proposed subdivision improvements, including the general layout plans, the utility plans, and other construction details such as storm sewers, and that defendants obtained final approval of such improvements from the Village. Everything that needed to be done to get the property annexed and subdivided had been accomplished with the exception of the final vote of the Board. Additionally, buyers had already contracted for the 10 contemplated lots on the subject property at an average price of $224,000 per lot.

On October 25, 1988, the District sent the Village a notice of intent to acquire certain properties including the subject property. The District's notice had the effect of halting defendants' annexation plans.

In a letter dated November 23, 1988, defendants proposed two alternatives to the District's plan to acquire their property. One alternative was to exclude the subject property from acquisition. The second was to pay the fair market value for the property plus damages, which the District's acquisition would cause the remainder of the 35-acre

tract. In the letter defendants set forth the amount they anticipated from the sale of the 10 two-acre lots on the subject property, listing the name of each purchaser and the sale price of each lot. The amount defendants were to realize equalled $2,248,000. From this amount defendants subtracted $382,309 spent for site improvements, consisting primarily of roads, sewer, and water, $27,395 for engineering fees, and $75,397 in Village fees, arriving at the final figure of $1,762,899 which represented defendants' demand for the subject property. Defendants pointed out that damages to the remaining 15 acres of the 35-acre parcel would depend upon whether it was possible still to achieve contiguity with the Village for the remainder if the subject property was acquired by the District. As with the subject property, defendants also had purchasers for all the lots on the remainder.

On December 19, 1988, defendants wrote to the District, repeating their demand of $1,762,899 and asking if the District was willing to pay the amount and, if not, what amount the District would offer. On December 20, 1988, Donald Morrison, an attorney for the District, responded to defendants' letter, explaining that the District was awaiting an appraisal report on the subject property and would thereafter send a letter of offer to defendants. In a letter, dated March 28, 1989, the District offered $900,000, the appraised price, for the subject property. Following receipt of this offer, defendants contacted Morrison, pointing out that since the District's offer was conditioned on the approval by the District's board of commissioners, defendants wanted some assurance, before beginning negotiations, that the District was willing and able to proceed. Defendants asked that the District first approve acquisition of their property and that it assure defendants that it had appropriated sufficient funds for an acquisition of the subject property in an amount at least equal to the offer made by the District.

On April 14, 1989, Alan Richards and Gerald Vargo, two of the partners in the Swanson Farms Partnership, and Roland Eckert, counsel for defendants, met with Joseph Morrison, another attorney for the District, with the intention of negotiating the price for the subject property. According to Richards' testimony at the evidentiary hearing, he learned at the April 14 meeting that Morrison had no authority to commit the District to the $900,000 amount, nor could Morrison guarantee defendants that, if they accepted the offer, they would be assured that amount by the District. On cross-examination, however, Richards admitted that Morrison had explained to him the process that the District followed in designating property for acquisition and in negotiating with the owners of the property for the pur-

chase of the property. Additionally, Richards admitted that Morrison had told him the District had the money to pay for defendants' property. Richards also testified that he suggested the District not purchase the subject property and that at no time during the meeting did he suggest any other amount other than the original price demanded by defendants.

On April 17, 1989, Morrison wrote to defendants, stating that the "general consensus" at the April 14 meeting was that the District's "offer of $900,000 was not acceptable to the owners" of the subject property, especially in light of the fact that defendants in their letter of November 23, 1988, "demanded the sum of $1,700,000 [*sic*] for the acquisition of the property." Morrison concluded with the statement: "Under these circumstances, we were unable to agree as to a price to be paid for this property." On April 20, 1989, Morrison sought the approval of the District's land acquisition committee to condemn the subject property. The Committee granted Morrison the authority to file a condemnation suit, and on April 24, 1989, Morrison filed the District's condemnation complaint.

It is defendants' argument that the District's $900,000 offer was, in effect, no offer at all because, as set forth in the District's March 28, 1989, letter, the $900,000 was subject to approval by the District's board of commissioners. As such, defendants claim, the District had not presented a true offer.

The District contends, however, that the Eminent Domain Act does not require an offer but only an attempt to agree (Ill. Rev. Stat. 1987, ch. 110, par. 7—102) and that the supreme court in *County Board of School Trustees v. Boram* (1962), 26 Ill. 2d 167, specifically disavowed that an offer was compulsory. Rather, "an offer is not necessary where *** it is clear from the acts of the parties that it would be futile." (26 Ill. 2d at 170.) The District maintains that it was clear from defendants' acts that an offer was futile. Such acts, the District asserts, included the wide disparity between values placed upon the subject property by the District and by the defendants as well as defendants' unwillingness to negotiate.

The wide disparity in value placed on the subject property occurred because the parties used differing theories on how to value the property. Defendants valued the property using a "subdivision approach" which included loss of profits. Although defendants had purchased the property for $280,000 in March 1987, they were demanding $1,762,899 for the same property two years later. The District, however, utilized a "market value approach," valuing the entire 19.66 acres as a single parcel worth $900,000. The $900,000 amount was of-

fered pursuant to procedures set forth in section 12 of "An Act to provide for the creation and management of forest preserve districts in counties having a population of less than 3,000,000" (the Forest Preserve Act) (Ill. Rev. Stat. 1987, ch. 96½, par. 6322), which required the District's board of commissioners (the Board) to approve all expenditures of money.

In Lake County the expenditures for land acquisitions by the District involve a two-step process. First, the District determines the necessity for acquiring a particular parcel. In the instant case, this was done by the formal adoption by the District of a resolution to acquire defendants' land. Second, an appraisal is made of the property to be acquired. The appraisal is submitted to the land acquisition committee for its approval. Following its approval, the Committee authorizes its attorneys to make the owner of the property an offer by letter for his property. If the owner agrees with the amount offered, the attorneys bring that amount back before the Board for its approval. If the owner does not agree to the amount offered by the District, the letter of offer encourages the owner to contact the District to discuss the amount of compensation to be paid.

In the instant case, the District determined by resolution, dated October 21, 1988, that acquisition of the subject property was necessary for "forest preserve, flood control, and related purposes." The resolution authorized the District's attorneys to order an appraisal of the property. In the interim, the District informed defendants that the District had adopted a resolution to acquire defendants' land and invited defendants to confer with the District regarding the purchase of the land. Defendants responded by letter with a demand of $1,762,899 for their property. Based on the appraisal the District received of defendants' property, the District offered $900,000 for the property. Defendants informed the District that the offer was inadequate, and the parties then met on April 14, 1989, to discuss their purchase price.

At that meeting the District's attorney, Morrison, explained the process the District must follow in acquiring defendants' property and also assured defendants that the District had the funds to pay them the $900,000 the District had offered. During the meeting, defendants suggested that the District not purchase their property. Defendants did not suggest any amount other than that which they had originally demanded. Defendants maintain that they did not suggest any other sum because Morrison had no authority to bind the District to any amount agreed upon by the parties.

The resolution to acquire defendants' property authorized Morri-

son to "attempt to agree" with defendants regarding the compensation to be paid for their property. Under both *County Board of School Trustees v. Boram* (1962), 26 Ill. 2d 167) and the Eminent Domain Act (Ill. Rev. Stat. 1987, ch. 110, par. 7—102), nothing more was required. Here, however, defendants made no attempt to agree. At the meeting designed to discuss the purchase of the property defendants proposed no new figure for their property. At the conclusion of the meeting the difference between the defendants' demand and the District's proposed purchase price was more than $800,000.

Following the meeting, Morrison wrote defendants stating that the general consensus of the meeting was that $900,000 was unacceptable to defendants for the acquisition of their property and that the parties were unable to agree on a price to be paid. Defendants did not respond to Morrison's letter. He then recommended condemnation.

■ Under the circumstances presented here, we believe the District made a *bona fide* attempt to reach an agreement with the defendants and that the wide disparity in value placed upon the property by the parties and the failure of the defendants to negotiate any further on April 14 to reduce that disparity justified the District's taking of defendants' property.

Cases relied upon by the District illustrate that the disparity in the value placed upon the subject property by the parties made it evident after the April 14 meeting that no practical solution could be reached. In *City of Oakbrook Terrace v. La Salle National Bank* (1989), 186 Ill. App. 3d 343, the owner contacted the city, offering to sell his property for $382,500. The city had the property appraised and sent the owner an offer of $80,000, the appraised price, but the owner never responded. Based on the disparity between the offer and the demand, this court concluded that the city had made a sufficient effort to reach an agreement on compensation and that no further negotiations were necessary prior to filing its condemnation complaint.

In *Waukegan Port District v. Booras* (1977), 55 Ill. App. 3d 790, a series of correspondence transpired between defendants' attorney and the Port District's attorney concerning the Port District's eventual acquisition of defendants' property. Defendants demanded $225,000 but made no follow-up on this demand. When the Port District, in a contract to purchase, offered defendants $100,000 for their property, defendants made no reply to the Port District's offer, and, therefore, the Port District filed a petition for condemnation. The court found that the Port District had made a *bona fide* attempt to agree and stated:

"[I]n light of the defendants' earlier demand of $225,000 for their property and their contention that they ought to be compensated for the incomplete remodelling, it is clear that the defendants and the port district [*sic*] had differing theories on how to value the property, thereby leading to a wide disparity in the value they placed on the real estate. Under such circumstances it is clear that no practical solution could have been reached by further negotiations, and, therefore, none were needed." 55 Ill. App. 3d at 793-94.

In the instant case, defendants made a demand for greater than the District's offer and based it on proposed improvements to the property and loss of profits rather than on the fair market value of the property. Defendants also claimed damages to the remainder while the District denied there were any damages. As in *Booras*, the parties had differing theories on how to value the property, and these differences led to the wide disparity in value.

In *Peoples Gas Light & Coke Co. v. Buckles* (1962), 24 Ill. 2d 520, the gas corporation offered to purchase underground storage rights from defendants for $45 per acre, or $7,200 for 160 acres of defendants' land. Defendants valued the underground storage easement at approximately $300,000. The supreme court pointed out that the disparity in value placed upon defendants' property by defendants and by condemnor showed that no practical solution could have been reached through further negotiations.

In *City of Evanston v. Piotrowicz* (1960), 20 Ill. 2d 512, defendant made a demand for $40,000. The condemnor counteroffered with a figure of $12,000, but defendant continued to demand $40,000. In finding that the city had proved its right to condemn defendant's property, the supreme court pointed out the substantial difference between the parties' valuation of the property in question and stressed that defendant's continued demand of $40,000 strongly suggested that the parties were unable to agree.

The foregoing cases clearly support the District's argument that the wide disparity in value placed upon the subject property and brought about by the parties' differing theories on how to value the property made any further negotiations after April 14, 1989, futile.

■ Defendants assert that the District's offer could not be considered a *bona fide* one since the amount offered to defendants had to be submitted to the Board for final approval. Defendants maintain that an offer creates in the offeree "a power of acceptance permitting the offeree by accepting the offer to transform the offeror's promise into a contractual obligation" (Black's Law Dictionary 976 (5th ed.

1979)) and that, therefore, the District's $900,000 offer was no offer at all. Had defendants accepted the $900,000, that acceptance, defendants assert, would not have transformed the offer into a contractual obligation since the $900,000 would then have to be approved by the Board.

It is defendants' position that in order for the $900,000 to be considered an offer the Board should have first approved the $900,000 compensation and then offered it to defendants without the final approval condition. Such a procedure, however, would have had the effect of causing the Board to negotiate directly with the defendants. For example, if defendants rejected the $900,000 and demanded a larger amount, that amount would then have to be taken back to the Board for approval. Following the Board's decision on defendants' demand, the decision would have to be taken back to defendants, who could accept or reject the decision. Defendants' acceptance or rejection would then be relayed to the Board for further action on its part. This procedure could go on indefinitely, becoming unduly burdensome as well as impractical and extremely time-consuming. The District's procedure of first attempting to agree with an owner on the price to be paid for his land, as was the District's purpose in meeting with the defendants on April 14, and then taking that agreed price to the Board for final approval is far more reasonable than the procedure suggested by defendants.

Furthermore, the procedure followed by the District in the instant case is required by law. The Forest Preserve Act requires that all proposals to expend money must be approved by the majority of the Board. (Ill. Rev. Stat. 1987, ch. 96½, par. 6322.) The District cannot circumvent that requirement by adopting a broad base appropriations ordinance and then spending money wherever it pleased. Rather, it was required to bring specific expenditures, *e.g.*, the $900,000 for defendants' property, back to the Board for approval.

When the District adopted the October 1988 resolution to acquire defendants' property, no appraisal of that property had been done. The resolution directed the land acquisition committee and the attorneys for the District to obtain such an appraisal and subsequently to offer to purchase the property in question at the appraisal price subject to approval by the Board. Such a condition was required under the terms of the Forest Preserve Act regarding expenditures (Ill. Rev. Stat. 1987, ch. 96½, par. 6322) and the process utilized by the District for land acquisitions.

We have found no Illinois cases which address the specific issue of whether an offer made subject to approval by the condemning author-

ity is, in fact, an offer. It is clear, however, that Illinois cases have never held that an offer must be a legally binding offer as in real estate cases. Rather, what is required in Illinois is a *bona fide* attempt to agree on the amount of compensation (see *Boram*, 26 Ill. 2d at 170), and that is exactly what the District attempted to accomplish when it met with defendants to discuss the wide disparity in value placed upon the subject property by the parties.

■ Finally, we address the District's contention that the court's finding that an appraisal was required to satisfy the good-faith attempt to agree requirement was contrary to law and against the manifest weight of the evidence. As defendants point out, however, the court made no such finding. Rather, the court found that the District's failure to consider defendants' entire 35 acres in making its appraisal gave rise to the implication that the District's offer was not a *bona fide* one. The court found:

> "Plaintiff's offer of full appraised value when the appraisal itself fails to value the whole parcel owned (35-acres in this case) and specifically ignores damage to remainder when the same appraisal acknowledged that Defendant's [*sic*] contiguous ownership is greater than the part taken and further acknowledges that the part taken is necessary to Defendant's [*sic*] annexation of property to the Village of Lincolnshire deprives such offer of *bona fides*."

In so stating, the court expressed its belief that the damages to the remainder should have been included in the District's appraisal since the part taken was contiguous to and necessary for the annexation of the remainder to the Village. The court, however, was mistaken regarding the annexation of the remainder. Under section 7—1—1 of the Illinois Municipal Code (Ill. Rev. Stat. 1987, ch. 24, par. 7—1—1), the remainder could be annexed to the Village even if the District acquired the subject property. Section 7—1—1 provides in relevant part:

> "Territory which is not contiguous to a municipality but is separated therefrom only by a forest preserve district may be annexed to the municipality pursuant to Sections 7—1—7 or 7—1—8 ***." Ill. Rev. Stat. 1987, ch. 24, par. 7—1—1.

It appears evident from the language of this provision that defendants' plans for development of the remaining parcel as part of the Anvil Farms Subdivision could still be carried out regardless of whether the District acquired the subject property. Any damages to the remainder would then appear to be limited to such factors as the costs attributable to the delay in completing development of the re-

mainder, which the District's condemnation had caused, and the increase in improvement costs which likely resulted from this delay. Nevertheless, if defendants believed that the remainder would be damaged in this manner or in some other way by the District's acquisition of the subject property, then they should have filed a cross-petition. (*Department of Public Works & Buildings v. Finks* (1956), 10 Ill. 2d 20, 23.) Without a cross-petition, a court is powerless to proceed with the assessment of damages. (*Central Illinois Public Service Co. v. Rider* (1957), 12 Ill. 2d 326, 332.) Since defendants here did not file a cross-petition for damages, it was error for the trial court to find that the District's failure to consider damages to the remainder demonstrated that the District's attempt to agree on a purchase price was not made in good faith.

For all of the foregoing reasons, we conclude the District acted in good faith in acquiring defendants' property by making a *bona fide* effort to agree with defendants as to the just compensation for their property prior to the filing of the District's complaint for condemnation. Accordingly, we reverse the judgment of the circuit court of Lake County and remand the case for further proceedings.

Reversed and remanded.

REINHARD and WOODWARD, JJ., concur.