THE FOREST PRESERVE DISTRICT OF DU PAGE COUNTY, Plaintiff v. BROOKWOOD LAND VENTURE, Defendant-Appellee (National Housing Partnership, Defendant and Intervenor-Appellant; Marquette Properties, Inc., Defendant).

Second District   No. 2—91—0745

Opinion filed June 3, 1992.

McLAREN, J., dissenting in part.

Christopher T. Van Wagner and Jerry A. Esrig, both of Epstein, Zaideman & Esrig, P.C., of Chicago (Robert J. Zaideman, of counsel), for appellant.

Thomas W. Fawell and Melbourne A. Noel, both of Katten, Muchin & Zavis, of Chicago, and Scott M. Day, of Helm & Day, of Naperville (David K. Schmitt, of counsel), for appellee.

JUSTICE NICKELS delivered the opinion of the court:

Intervenor, National Housing Partnership (NHP), appeals the order of the circuit court granting summary judgment to defendant, Brookwood Land Venture (Brookwood). NHP sought to participate in the just compensation determined by a jury as the fair-market value of certain property, which Brookwood owned and which was the subject of an underlying condemnation action. NHP's claim was based on a contract providing for such participation in the event Brookwood entered a sales or purchase agreement for the property within a given time frame. On appeal, NHP asserts that the circuit court erred in finding as a matter of law that: (1) the condemnation was not a contract for sale within the meaning of NHP's contract with Brookwood, and (2) if the condemnation was a contract for sale, such sale did not occur until after expiration of NHP's right to participate in the proceeds of the sale of the property. We affirm.

In 1984, NHP and Marquette Properties, Inc., entered a real estate sales contract with Brookwood and Capital Bank and Trust Company of Chicago, as trustee of a land trust, for the purchase of 27 acres of vacant land in Du Page County. However, Marquette Properties, Inc., is not involved in this appeal because, subsequent to the filing of the complaint in intervention, it assigned all its rights under that contract to NHP. The sales contract called for a purchase price of $1.6 million, set the latest possible closing date as November 28, 1984, and required NHP's payment of certain sums as earnest money. However, the closing was delayed by litigation concerning the only then existing access to the property filed by an adjacent homeowners' association alleging ownership of such access. NHP and Brookwood negotiated several amendments to the initial contract extending the closing date, for which NHP paid additional sums. Eventually, NHP and Brookwood entered an "Agreement Terminating Real Estate Purchase/Sale Contract" (termination agreement) on November 26, 1986. NHP's earnest money was returned, but the additional sums that had been paid to extend the purchase agreement were retained by Brookwood. The termination agreement further provided:

"(b) Seller [Brookwood] shall make a reasonable and good faith effort to sell the premises for cash to another buyer on such terms and conditions as are in the Seller's sole judgment acceptable to the Seller, provided only that Seller has no direct or indirect ownership or control of said buyer, and that the purchase/sale agreement is the result of good faith arm's length negotiations.

(c) If a contract for the sale of the Premises, as described in paragraph (b) above (the 'Subsequent Contract') is entered into prior to March 1, 1988, Purchaser [NHP] shall be entitled to participate in the 'Net Proceeds' (as hereinafter defined) resulting therefrom in accordance with the following:

(i) if the Net Proceeds are less than $1,600,000.00, Purchaser shall receive $160,000.00.

(ii) if the Net Proceeds exceed $1,600,000.00, Purchase shall receive the sum of $160,000.00 plus fifty percent (50%) of the amount by which Net Proceeds exceed $1,600,000.00, but in no event shall Purchaser receive more than $307,250.00."

After provision for a possible installment contract, the termination agreement defined "Net Proceeds" as the total cash consideration less expenses for title insurance, escrow charges, transfer taxes, real

estate commissions, real estate taxes, and interest on the existing mortgage incurred between the date of the termination agreement and any subsequent contract.

Early in February 1987, the Forest Preserve District of Du Page County (District) approached Brookwood to acquire the property. After Brookwood rejected the District's offer of $1,463,400 for the property, further negotiations were considered futile and ceased and a condemnation action was filed February 24, 1987. Although NHP was initially named a defendant, it was dismissed with prejudice in January 1988 with respect to any legal title or fee interest in the property, but without prejudice as to its rights under the termination agreement. NHP filed a complaint in intervention in June 1988 seeking injunctive and declaratory relief and damages based on the termination agreement.

In April 1989 after a jury trial, just compensation for the property was set at $2,211,898, which was upheld on appeal. (*Forest Preserve District v. Brookwood Land Venture* (1990), 199 Ill. App. 3d 973.) After completion of the condemnation proceeding, the circuit court allowed NHP's petition to intervene finding that its right to participate in the proceeds of a sale required the court to reach the issue now before us of whether the condemnation was a sale as that term was defined and used in the termination agreement. NHP and Brookwood filed cross-motions for summary judgment, and the circuit court granted Brookwood's motion. The circuit court found that the relevant provision of the termination agreement was only applicable to a voluntary transfer of title and that, in any event, the condemnation occurred outside the time frame allowed by the termination agreement. NHP timely appealed and now asserts that the court erred as a matter of law in finding that the termination agreement did not apply to transfer of title by condemnation filed but not concluded until after expiration of the contract.

Summary judgment is proper when the moving party is entitled to judgment as a matter of law. (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c); *Hagy v. McHenry County Conservation District* (1989), 190 Ill. App. 3d 833, 842.) The construction of the terms of a contract presents only a question of law and, therefore, is appropriate for summary judgment. *W.H. Lyman Construction Co. v. Village of Gurnee* (1985), 131 Ill. App. 3d 87, 93.

In construing the terms of a contract, a court looks first only to the language of the contract employed by the parties in describing their intent. (*Berutti v. Dierks Foods, Inc.* (1986), 145 Ill. App. 3d 931, 934.) If such language is clear and unambiguous, it will be

given its natural and ordinary meaning. (*Berutti*, 145 Ill. App. 3d at 934.) Assertions of mere disagreement between the parties over the meaning of the terms of a contract based on a subsequent unexpected turn of events cannot render an otherwise unambiguous contract ambiguous. (*Berutti*, 145 Ill. App. 3d at 934.) Rather, if a court can determine the meaning of a contract based on a simple knowledge of the facts on which the meaning of the language depends, no ambiguity exists. (*Berutti*, 145 Ill. App. 3d at 934.) Thus, a court may not place a construction on the terms of a contract that is contrary to the plain and obvious meaning of the language. (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 287-88.) The entire instrument must be considered in determining if an ambiguity exists (*United States Trust Co. v. Jones* (1953), 414 Ill. 265, 270-71), and the fundamental purpose of the agreement provides the context in which disputed language should be interpreted (*Pieszchalski v. Oslager* (1984), 128 Ill. App. 3d 437, 445-47).

Condemnation, or eminent domain, is the process by which a sovereign exercises the power to "take" private property for public purposes subject to the constitutional requirement that just compensation be paid to the owner. (*Department of Public Works & Buildings v. Kirkendall* (1953), 415 Ill. 214, 217.) No taking in the constitutional sense occurs until a condemnation petition is filed, just compensation is ascertained, and such compensation is paid. (*Towne v. Town of Libertyville* (1989), 190 Ill. App. 3d 563, 568.) Generally, no taking occurs until either a purchase or sale agreement is negotiated and executed or until condemnation proceedings, including payment, are concluded. (*Towne*, 190 Ill. App. 3d at 568; *Griffin v. City of North Chicago* (1983), 112 Ill. App. 3d 901, 906.) As a prerequisite to condemnation jurisdiction, the governmental body seeking to exercise its eminent domain powers must attempt to negotiate an agreement to purchase the subject property. (Ill. Rev. Stat. 1989, ch. 110, par. 7—102; *City of Chicago v. Harrison-Halsted Building Corp.* (1957), 11 Ill. 2d 431, 434; *Lake County Forest Preserve District v. First National Bank* (1990), 200 Ill. App. 3d 354, 356.) However, when circumstances demonstrate that agreement is unreachable, no further negotiations are necessary. (*Peoples Gas Light & Coke Co. v. Buckles* (1962), 24 Ill. 2d 520, 527-28; *Lake County Forest Preserve*, 200 Ill. App. 3d at 356.) Just compensation is "the amount of money which a purchaser, willing but not obligated to buy the property, would pay to an owner *willing but not obligated* to sell in a *voluntary* sale." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 110, par. 7—121.) Thus, although just compensation is determined by

attempting to approximate the voluntary marketplace, the essence of a condemnation is its involuntary, compulsory nature.

In contrast, a contract for sale or purchase requires a meeting of the minds, or mutual assent to the terms of the contract. (*D.B. Corkey Co. v. Koplin* (1988), 176 Ill. App. 3d 1096, 1102.) Such assent is generally the result of offer and acceptance. (*D.B. Corkey Co.*, 176 Ill. App. 3d at 1102.) Both a seller and a buyer have the right to select with whom each will contract, and neither can be forced to agree with another not of his choosing. (*Davito v. Blakely* (1968), 96 Ill. App. 2d 196, 201.) The terms of the contract must be definite before such meeting of the minds can occur and an agreement or contract can be deemed to have been reached. (*D.B. Corkey Co.*, 176 Ill. App. 3d at 1102; *Delcon Group, Inc. v. Northern Trust Corp.* (1989), 187 Ill. App. 3d 635, 643.) Thus, a contract or agreement for sale or purchase is a consensual, voluntary relationship. With this fundamental distinction between acquisition by condemnation and transfer of title pursuant to a contract or agreement, we turn to NHP's argument that the "contract for sale" language of the termination agreement included transfer of title by condemnation.

■ The clear and unambiguous language of the termination agreement applies to a "purchase/sale agreement" that is "the result of good faith arm's length negotiations." Such negotiations were completely subject to Brookwood's judgment as to what terms and conditions were acceptable, limited only by good faith as is implicit in the performance of every contract (see, *e.g., Madonna v. Giacobbe* (1989), 190 Ill. App. 3d 859, 866). The termination agreement expressly defines the "net proceeds" in which NHP was entitled to participate as the cash price less only those expenses traditionally associated with a voluntary, arm's length negotiated sale by a willing seller. Finally, the fundamental purpose of the termination agreement was to allow NHP to recoup some of the price it paid for what eventually became in essence an option agreement. NHP's ability to receive such recoupment was not only expressly limited in duration, but subject to Brookwood's good-faith willingness to become a seller on any given terms. We fail to find the challenged language ambiguous in light of the plain language of the termination agreement considered together with the language of the entire agreement in the context of its fundamental purpose, and we need look no further to determine the intent of the parties. The cases cited by NHP do not persuade us otherwise.

In *City of Chicago v. Carpenter* (1968), 95 Ill. App. 2d 81, 81-82, a promissory note given in exchange for one-half interest in the condemned property was both payable on demand and "payable when [the] property is sold." On the obligor's death, his one-half interest passed to his sons. When the proceeds of the condemnation were to be distributed, the sons and holder of the note both participated in the proceeds as owners of the property, but the holder of the note sought payment for the obligor's share of that investment from the obligor's share of the proceeds of the condemnation. Finding the language of the note ambiguous, the court looked to the intent of the parties based on the circumstances of its execution. Because the transaction was speculative with no requirement of initial investment, the court found that the maker of the note intended to pay for his portion of such investment from any proceeds realized at the time such proceeds were realized. *City of Chicago*, 95 Ill. App. 2d at 83-87.

*City of Chicago* is initially and fundamentally distinguishable from the present instance in that there is no ambiguity in the termination agreement. In addition, NHP did not invest in the property speculating that its value would increase and generate a profit, but rather the purpose of the termination agreement was to allow NHP to extinguish both the risks and costs associated with its continued interest in the property. Finally, the limited recovery of NHP's expenses under the termination agreement, unlike the note in *City of Chicago*, was also expressly limited in duration. Thus, *City of Chicago* is not controlling because the termination agreement is not ambiguous, its purpose was not speculative investment, and it did not allow NHP unlimited recovery of its expenses.

Nor do we find NHP's citation of isolated references arising in inapposite contexts from other precedent persuasive. *Vournas v. Montgomery County* (1982), 53 Md. App. 243, 452 A.2d 1263, concerned an owner's attempt to avoid payment of a statutory transfer tax where the statute specifically defined such transfer as acts by the parties or *by law* through which title to property is conveyed from one person to another. (*Vournas*, 53 Md. App. at 252, 452 A.2d at 1269.) In discussing the claim of a landowner in *Langston v. City of Miami Beach* (Fla. App. 1971), 242 So. 2d 481, to just compensation for a portion of the private roadway abutting his property, the Florida court concluded that the government had the same rights upon completion of the condemnation as would a third party upon a *bona fide* sale. (*Langston*, 242 So. 2d at 482-83.) Finally, the United States District Court for the Northern District of Illinois

merely acknowledged that a statutory grant of authority to a governmental agency to acquire land by purchase for the legitimate governmental purpose of conservation also included acquisition for the same purpose by eminent domain. (*United States v. 2.74 Acres of Land in Williamson County* (E.D. Ill. 1940), 32 F. Supp. 55, 57.) Thus, NHP's argument fails because each of these precedents concerns the authority of the government to initiate eminent domain proceedings or the status of the government upon completion of such proceedings, and each contains nothing to persuade us that a condemnation is a sale as that term was used in the termination agreement.

●3 In light of our finding that the circuit court did not err in construing the unambiguous language of the termination agreement, it is unnecessary to consider whether the condemnation occurred at the point in time at which the condemnation complaint was filed or not until the condemnation was concluded and the just compensation determined by the jury was paid. However, we note that no taking occurs until just compensation is *paid*. (*Towne*, 190 Ill. App. 3d at 568.) Until such time, a governmental body is free to decline to proceed with the condemnation. (*Department of Transportation v. La Salle National Bank* (1981), 102 Ill. App. 3d 1093, 1099; see also, *e.g., Commissioners of Lincoln Park v. Schmidt* (1944), 386 Ill. 550.) So, too, during the time between the filing of a condemnation complaint and a jury's finding, the parties are free to continue to negotiate towards a consensual purchase agreement. Thus, an eminent domain proceeding is again distinct from a contractual relationship because in a condemnation proceeding the seller has neither the right to require performance nor a cause of action for damages caused by the government's failure to complete the process. (*Cf.* Ill. Rev. Stat. 1989, ch. 110, par. 7—123 (attorney fees, costs, and expenses of defense recoverable if government dismisses condemnation proceeding prior to judgment).) Until a seller acquires some right of redress against the buyer, we find that a transfer of title by either sale or condemnation does not occur.

■ Finally, Brookwood asserts that NHP's appeal of these issues was frivolous and seeks sanctions against NHP pursuant to Supreme Court Rule 375(b). (134 Ill. 2d R. 375(b); *Kennedy v. Miller* (1990), 197 Ill. App. 3d 785.) Although the authority cited by NHP has failed to persuade us and, in some instances, has only tangential relation to the facts of this appeal, we nevertheless find NHP's assertions were not frivolous. Rather, the dearth of timely relevant au-

thority on point indicates that the issues raised warranted our attention.

We find no authority for parsing an appeal into individual issues in considering its merit, but rather "[a]n appeal will be deemed frivolous where it is not reasonably well grounded in fact and not warranted by existing law or a good-faith argument for the extension, modification, or reversal of existing law" (134 Ill. 2d R. 375(b)). In contrast, failure to comply with the rules on appeal is applicable to the conduct relating to individual issues, and the sanctions provided are directed to the individual issues to which the offending conduct relates. (134 Ill. 2d 375(a).) Therefore, for purposes of Supreme Court Rule 375(b), we decline to consider separately the two interrelated issues asserted by appellant, which were themselves framed by the circuit court's order addressing not only the nature of a condemnation proceeding, but alternately the timing of that event.

The order of the circuit court granting the motion for summary judgment of defendant, Brookwood Land Venture, is affirmed.

Affirmed.

BOWMAN, J., concurs.

JUSTICE McLAREN, respectfully dissenting in part:

I respectfully dissent. I believe this appeal is frivolous and subject to sanctions pursuant to Supreme Court Rule 375(b) (134 Ill. 2d R. 375(b)).

The majority opinion resolved the merits of the first trial court's ruling, but did not resolve the merits of the second trial court's ruling. I believe the appeal, dependent upon reversing the trial court's second ruling, is frivolous and is nothing more than a feeble attempt to force a large peg into a smaller square hole. The following is the *entire* argument of appellant regarding the trial court's second ruling. The appellant's brief states as follows:

> "THE TRIAL COURT ERRED IN HOLDING AS A MATTER OF LAW THAT THE TAKING BY CONDEMNATION, EVEN IF A SALE WITHIN THE MEANING OF THE TERMINATION AGREEMENT, DID NOT TAKE PLACE WITHIN THE TIME REQUIRED BY THAT AGREEMENT.
>
> As part of the basis of its judgment in favor of Brookwood, the trial court concluded that the transfer of title of the Property through the process of condemnation did not 'fall within the time limitations of the agreement.' (SR. C187,

App. 2). Simply stated, there is absolutely no basis for this reading of the Termination Agreement.

It is irrelevant that the condemnation award was not made and the monies not paid by the District until after March 1988, *so long as the condemnation petition was filed before that date.* [(Emphasis added.)] The time limits in the Termination Agreement refer only to the date of contracting and sets [*sic*] no deadline as to when the transaction must actually be concluded in order for NHP to be entitled to a portion of the proceeds.

By its express terms, the Termination Agreement contemplates that the ultimate sale might be consummated after March 1, 1988. Thus, paragraph 2(d) of the Termination Agreement provides:

'*If no Subsequent Contract* [for the sale of the Property] *is entered into by March 1, 1988,* or if one previously entered into is terminated prior to its consummation after March 1, 1988, then *this agreement shall terminate and be of no further force or effect* \*\*\*. [APP. 48]' (Emphasis added.)

The trial court simply misread the Termination Agreement in concluding that the condemnation was not timely."

The appellant's reply brief states as follows:

"THE TRIAL COURT ERRED IN HOLDING AS A MATTER OF LAW THAT THE TAKING BY CONDEMNATION, EVEN IF A SALE WITHIN THE MEANING OF THE TERMINATION AGREEMENT, DID NOT TAKE PLACE WITHIN THE TIME REQUIRED BY THAT AGREEMENT.

Without explanation, the trial court concluded that the transfer of title of the Property through the process of condemnation did not 'fall within the time limitations of the agreement.' Brookwood now attempts to justify this misreading of the Termination Agreement by noting that the condemnation judgment was entered on the jury's verdict well after the contract deadline of March 1, 1988. Brookwood ignores the fact, however, that this deadline refers not to consummation of the sale, but to the execution of a contract.

As noted in NHP's initial brief (and ignored by Brookwood), the Termination Agreement, by its express terms, contemplates that the ultimate sale might be consummated after March 1, 1988. Hence the key date is tied not to a sale, but to the execution of a contract for sale:

*'If no Subsequent Contract* [for the sale of the Property] *is entered into by March 1, 1988,* or if one previously entered into is terminated *prior to its consummation after March 1, 1988,* then this agreement shall terminate and be of no further force or effect \*\*\* (emphasis added).'

This provision also renders irrelevant Brookwood's argument that the Forest Preserve District could have, after March 1, 1988, discontinued its efforts to obtain the property. If that happened, and if the sale was never consummated, the Termination Agreement would be deemed terminated and NHP would have no claim thereunder. The same would be true, under the above referenced language, if a private purchaser terminated its efforts to obtain title to the property prior to consummation of the sale after March 1, 1988. The parties clearly contemplated that a sale might fall apart in mid-stream, and that such an occurrence would negate NHP's rights. Of course, this did not happen, and the District did in fact purchase the Property."

The argument wholly fails to establish, let alone address, that the filing of the condemnation suit by the adverse third party is the equivalent of a "subsequent contract entered into by March 1, 1988." This equivalency is an essential element of appellant's theory of reversing the trial court's ruling and its final judgment. As it fails, so does the entire appeal. The appellant knew or ought to have known that a successful appeal was dependent upon reversal of the trial court's second ruling. The failure to properly address the second ruling resulted in a frivolous appeal.

By analogy, a trial court finds no liability in tort because there is no duty on the part of the defendant *and* the statute of repose has run. An appeal as to the existence of a duty may arguably be valid. However, the *failure to properly address* the ruling of the statute of repose ought to result in sanctions for a frivolous appeal pursuant to Supreme Court Rule 375(b). In this case, the appellant has failed to properly address the termination of the contract, under its own terms, prior to liability for breach of contract arising. Therefore, I would grant sanctions pursuant to Supreme Court Rule 375(b) (134 Ill. 2d R. 375(b)) and therefore dissent as to the portion of the opinion denying sanctions.